SAES GETTERS, S.p.A., Plaintiff,

v.

ERGENICS, INC., Defendant.

Civ. A. No. 89–649.

United States District Court,
D. New Jersey.

June 15, 1992.

Burtis W. Horner, Stryker, Tams & Dill, Newark, NJ, Keith V. Rockey, Rockey & Rifkin, Chicago, IL, David R. Murphy, Quaintance & Murphy, Alexandria, VA, for plaintiff.

Bruce S. Edington, Robinson, St. John & Wayne, Newark, NJ, David F. Dobbins, Patterson, Belknap, Webb & Tyler, New York City and James Kinzer, Kinzer, Plyer, Dorn, McEachran & Jambor, Chicago, IL, for defendant.

## OPINION

CHESLER, United States Magistrate Judge.

## I. INTRODUCTION

This matter comes before the undersigned on plaintiff's application for a preliminary injunction prohibiting defendant Ergenics, Inc. from infringing United States Patent Number 4,312,669 (the "Boffito patent"). The parties have consented to have plaintiff's application heard and decided by the undersigned. An Order referring these proceedings to the undersigned was issued by the Honorable Harold A. Ackerman. An evidentiary hearing was held on March 17 and March 18, 1992; oral argument was heard on June 1, 1992.

## II. PROCEDURAL BACKGROUND

This action was commenced by plaintiff Saes Getters, S.p.A. ("Saes") on February 17, 1989. The original Complaint alleged that defendant Ergenics, Inc. ("Ergenics") infringed U.S. Patent Number 3,926,832 (the "Barosi patent"). Saes subsequently amended its Complaint to allege that Ergenics also infringed the Boffito patent through its marketing of products called HY STOR 402 and HY STOR 402C. On April 9, 1990, following an evidentiary hearing, Judge Ackerman issued a preliminary injunction prohibiting Ergenics from infringing the Barosi patent. *See* 15 U.S.P.Q.2d. 1212 (D.N.J.1990). On July 30, 1990, Judge Ackerman issued a similar preliminary injunction against Ergenics's infringement of the Boffito patent through the marketing of HY STOR 402 and HY STOR 402C. *See* 17 U.S.P.Q.2d. 1581 (D.N.J.1990). In each case, Judge Ackerman concluded that, while Ergenics did not literally infringe Saes's patents, infringement could be found under the doctrine of equivalents.

Thereafter, Ergenics began marketing a new product, HY STOR 405. Saes further amended its Complaint to allege that HY STOR 405 infringed the Boffito patent. Saes then moved for a preliminary injunction to enjoin Ergenics from marketing this product and for partial summary judgment upholding the validity of the Boffito patent. In an Opinion and Order issued this same date, the Court has granted Saes's motion for partial summary judgment.

## III. FACTUAL BACKGROUND [1]

The Boffito patent is a process patent. It covers a "gettering" process, which is a process used to maintain a vacuum in various products, such as cathode ray tubes. Specifically, the Boffito patent encompasses a gettering process capable of sorbing water, water vapor, and other gases at low temperatures and at low pressures, without the release of hydrogen. A particular advantage of this process is that the getter can be activated at temperatures lower than those used in prior processes. As conceded by Dr. Gary Sandrock, Ergenics's expert, the Boffito patent is the "first commercially successful metal getter, nonevaporable getter, that could be activated at low temperature." Deposition of Dr. Gary Sandrock at 36.

Claims 1 and 3 of the patent are representative of the patent's claims.[2]

Claim 1 of the patent specifies the composition of the getter metal to be used in the process and calls for 45–75 percent by weight zirconium, 20–50 percent by weight vanadium, and 5–35 percent by weight iron. *Id.* ¶ 7. Specifically, claim 1 of the patent states:

We claim:

1. *A process* for the sorption of gas from a closed vessel comprising the steps of:

(A) introducing into the vessel a nonevaporable ternary gettering alloy whose composition in weight percent when plotted on a ternary composition diagram in weight percent Zr. [zirconium] weight percent V [vanadium] and weight percent Fe [iron] lies within a polygon having as its corners the points defined by:

a—75% Zr—20% V—5% Fe

b—45% Zr—20% V—35% Fe

c—45% Zr—50% V—5% Fe

(B) evacuating the vessel to a pressure of less than 10 (–2) torr

(C) activating the gettering alloy by heating the ternary alloy to a temperature of greater than 700 degrees C, and

(D) reducing the temperature to a value between 400 degrees and 25 degrees C. *See* Plaintiff's Bench Book of Exhibits ("Plaintiff's Exhibit"), Exhibit A at col. 7 (emphasis added).

Similarly, claim 3 of the patent states:

We claim:

1. A process for the sorption of gas from closed vessels comprising the steps of:

(A) introducing into the vessel a nonevaporable ternary gettering alloy whose composition in weight percent when plotted on a ternary composition diagram in weight percent Zr. [zirconium] weight percent V [vanadium] and weight percent [iron] lies within a polygon having as its corners the points defined by:

a—75% Zr—20% V—5% Fe

b—45% Zr—20% V—35% Fe

c—45% Zr—50% V—5% Fe

(B) evacuating the vessel to a pressure of less than 10 (–2) torr

(C) activating the gettering alloy by heating the ternary alloy to a temperature of not greater than 450 degrees C for a time of between 1 to 10 minutes; and

(D) reducing the temperature to a value between 400 degrees and 25 degrees C. *See* Plaintiff's Exhibit A at col. 8.

Overall, the various claims of the Boffito patent cover the following composition ranges: zirconium, 45—75%; vanadium, 20—50%; and iron, 5—35%.

Defendant's product HY STOR 405 has the following composition: zirconium, 80.9%; vanadium, 15.1%; manganese, 3.0%; aluminum, .42%; and trace elements, balance.[3]

The activation process for HY STOR 405, its range of recommended applications, and

---

1. For a complete understanding of the facts surrounding the dispute between Saes and Ergenics, see *Saes Getters, S.P.A. v. Ergenics, Inc.,* 15 U.S.P.Q.2d 1212, 1990 WL 117967 (D.N.J.1990) and *Saes Getters, S.P.A. v. Ergenics, Inc.,* 17 U.S.P.Q.2d 1581, 1990 WL 117970 (D.N.J.1990).

2. The Boffito patent consists of eight claims involving varying percentages of the getter metals and different activating temperatures.

3. The nominal composition of ST 405 is 80.0% zirconium, 15.6% vanadium, 4.0% manganese and .4% aluminum. Plaintiff's Exhibit L.

temperature and pressure recommendations for its subsequent use clearly practice the process outlined by the Boffito patent. Deposition of David DaCosta ("DaCosta Dep.") at 24–25, 34–35, 39–42; Plaintiff's Exhibits T, U, V. In fact, Ergenics concedes that its recommendations and instructions for use of HY–STOR 405 induce infringement of the Boffito patent if the HY–STOR 405 is found to be equivalent to the formulations set forth in Boffito's claims.

## IV. DISCUSSION

■ A plaintiff in a patent case is entitled to the issuance of a preliminary injunction when it has demonstrated that it has a reasonable likelihood of success on the merits and that it will suffer irreparable harm if the injunction is not granted. *H.H. Robertson Co. v. United Steel Deck, Inc.*, 820 F.2d 384, 387 (Fed.Cir.1987). In ruling on a motion for a preliminary injunction, the Court, where appropriate, also should evaluate public interest concerns and should consider appropriate equitable factors. *Id.*

### A. *Reasonable Likelihood of Success on the Merits*

As indicated earlier, this Court already has upheld the validity of the Boffito patent. Thus, the Court now must determine whether there has been an adequate demonstration that the patent is infringed by Ergenics. Saes does not contend that Ergenics's conduct constitutes literal infringement; rather, Saes argues that Ergenics is guilty of infringement under the doctrine of equivalents.

■ The doctrine of equivalents protects a patentholder from the would-be infringer who seeks to avoid liability by introducing minor and insubstantial changes to the patented invention that would be sufficient to avoid a finding of literal infringement. *See Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950). Thus, infringement *may* be found under the doctrine of equivalents if an accused product "performs substantially the same overall function or work in substantially the same way, to obtain substantially the same overall result as the claimed invention." *Pennwalt Corp. v. Durand–Wayland, Inc.*, 833 F.2d 931, 934 (Fed. Cir.1987) (*en banc*), *cert. denied*, 485 U.S. 1009, 108 S.Ct. 1474, 99 L.Ed.2d 703 (1988).

This tripartite test was formulated by the Supreme Court in the *Graver Tank* case. In applying this test, the Court must make a practical evaluation of the particular circumstances involved. The doctrine does not require complete identity for every purpose and in every respect:

> In determining equivalents, things equal to the same thing may not be equal to each other and, by the same token, things for most purposes different may sometimes be equivalents. Consideration must be given to the purpose for which an ingredient is used in a patent, the qualities it has when combined with the other ingredients, and the function which it is intended to perform. An important factor is whether persons reasonably skilled in the art would have known of the interchangeability of an ingredient not contained in the patent with one that was.

*Graver Tank*, 339 U.S. at 609, 70 S.Ct. at 857.

■ In this case, the issue confronted by the Court is whether the substitution of manganese (with a minute amount of aluminum) for the iron called for in the Boffito patent, along with slight modifications of the zirconium and vanadium percentages called for in the patent, result in a process which performs substantially the same function in the same way and with the same result as the process described by Boffito.

Ergenics concedes that HY STOR 405 performs substantially the same function as the Boffito compounds, but vigorously argues that it does not do so in the same way or with the same result. Ergenics contends that HY STOR 405 accomplishes a substantially improved result and achieves it in a different way.[4]

---

4. Defendant argues that, in addition to the three-part test described above, *Slimfold Mfg. Co., Inc. v. Kinkead Industries, Inc.*, 932 F.2d 1453 (Fed.

Cir.1991), also requires a finding of noninfringement if there has been "a substantial change" made to the patented invention. *Id.* at 1457.

The evaluation of this claim should be made in light of prior proceedings in this case. As noted earlier, two preliminary injunctions already have been issued against Ergenics. One of these injunctions prohibits Ergenics from infringing the Boffito patent through use of its HY STOR 402 and HY STOR 402C getters. In formulating these products, Ergenics substituted a small amount of nickel for some of the iron called for in the Boffito patent. As found by Judge Ackerman, nickel performs the same function as iron performs in getters; both catalyze the dissociation of hydrogen. Furthermore, it would have been known to anyone reasonably skilled in the art, that "it was feasible to slightly reduce the amount of iron in the gettering device and replace it with nickel." 17 U.S.P.Q.2d. at 1589. Judge Ackerman also noted that "it appears that defendant (once again) intentionally set out to copy plaintiff's invention and incorporate minor deviations in order to avoid infringement." 17 U.S.P.Q.2d. at 1590.

During the preliminary injunction proceedings concerning HY STOR 402, Ergenics accelerated its development of HY STOR 405. Ergenics's Vice–President of Sales, David DaCosta testified as follows:

> Q. Isn't it a fact that the reason you came out with 405 was because your then current product, 402, had been enjoined by Judge Ackerman?
>
>     *    *    *    *    *    *
>
> A. We accelerated development of 405 in case 402 would become enjoined during the request for preliminary injunction preventing us from selling 402.

Transcript of March 17, 1992 at 103.

Thus, while Ergenics was facing the prospect of having the use of HY STOR 402 and 402C enjoined, it was attempting to develop an alternative compound that employed a different substitute for iron, namely, manganese.[5]

Prior to the hearing on the instant application, defendant's expert, Dr. Sandrock, testified that manganese was one of a number of transition metals, such as nickel and iron, that can serve as a catalyst to facilitate the dissociation of hydrogen.[6] *See* 17 U.S.P.Q.2d. at 1584. At the hearing before the undersigned, however, Dr. Sandrock partially disavowed his prior statements, testifying as follows:

> It's true that Manganese does dissociate Hydrogen like other transition metals, but it is by far, by far the worst possible element you can add if you [are] worried only about dissociation of Hydrogen molecules.
>
> It's a terrible catalyst compared to Iron, Nickel and Cobalt in the next group over which are admittedly very good catalysts. It will dissociate Hydrogen, but much more slowly and much more poorly, and the reason I added Manganese, of course, the 405 is not for Hydrogen dissociation, but I did make that statement and that statement was really, at least in degree, a blunder and error.

Testimony of Dr. Sandrock, March 17, 1992 ("Sandrock Testimony") at 136–37.

Accepting Dr. Sandrock's more recent testimony as accurate, it is still clear that manganese functions as a dissociative catalyst, albeit less effectively than iron does, and, therefore, could perform that function in place of iron.

Dr. Sandrock also testified before the undersigned that he believed that Boffito used iron as the transition element in his patent because ferro-vanadium alloys could be bought relatively inexpensively. Sandrock Testimony at 193–94. Dr. Sandrock then was asked, and answered, the following question:

---

The Court views this language from *Slimfold* as simply another way of expressing the *Graver Tank* tripartite test.

5. While there exists a small amount of aluminum in the HY STOR 405 compound, there is no evidence that it plays any substantial role in the gettering process; therefore, its presence is irrelevant for the purpose of these proceedings.

6. A dissociation catalyst facilitates the separation of one $H_2$ molecule into two separate hydrogen atoms. This process speeds up the sorption of hydrogen, but does not increase the capacity of the getter to sorb hydrogen.

Q. Now, didn't you also infer that skilled workers, people like yourself, would recognize that other transition metals could be used in place of iron, albeit at greater expense?

A. Yes.

Sandrock Testimony at 194.

Thus, Ergenics has conceded that it would have been obvious to one reasonably skilled in the art, such as Dr. Sandrock, that manganese could substitute for iron as a transition element in the getter.

In addition to serving as a disassociative catalyst for hydrogen, Saes contends that iron also serves, in part, to reduce the pyrophoricity[7] of the vanadium-zirconium compound. Declaration of Dr. Bruno Ferrario at 4. This reduction in pyrophoricity is necessary to reduce the dangers of working with the compound.

Ergenics contends that the addition of manganese to a getter serves a contrary purpose, because, according to Dr. Sandrock, manganese tends to increase the pyrophoricity of a compound. Sandrock Testimony at 123. Thus, if Dr. Sandrock's theory is accurate, HY STOR 405 would be expected to have a lower flash point and to be more pyrophoric than a getter containing only vanadium, zirconium, and iron. The only experimental evidence before the Court that addresses this issue consists of tests comparing the flashpoints of ST 707,[8] plaintiff's product which practices the Boffito patent, and HY STOR 405. These tests, however, indicate that the pyrophoricity of both compounds is approximately equal.[9] More significantly, both compounds have substantially higher flash points than those shown by tests conducted on a compound composed of only vanadium and zirconium. Sandrock Testimony at 182–83. This suggests that *both* ST 707 and HY STOR 405 are *less* pyrophoric than a pure vanadium-zirconium compound.[10] Thus, the only experimental data before the Court suggests that manganese and iron perform the same basic functions.

Saes also has submitted substantial evidence that defendant's getter obtains substantially the same results as those of the claimed invention. Such evidence is based upon comparisons between HY STOR 405 and ST 707. In general terms, both products achieved similar results in terms of sorbing carbon monoxide and hydrogen. Ferrario Dec. at 6; Plaintiff's Exhibit S. To the extent that there were differences, Dr. Ferrario's testimony that they largely resulted from differences in particle size, porosity, and degree of compression is highly credible. Testimony of Dr. Bruno Ferrario, March 17, 1992 ("Ferrario Testimony") at 48–49. These mechanical differences account for the variation in performance as illustrated by Ergenics in Defendant's Trial Exhibit 17 (showing ST 707 to have gettering rates initially higher than those of HY STOR 405 and HY STOR 405 to have a capacity for carbon monoxide 25% higher than that of ST 707). *See* Defendant's Trial Exhibit 17; Transcript of March 17, 1992 at 48–49. In fact, in tests comparing the two compounds, where all variables except the chemistry of the compounds were controlled, HY STOR 405 displayed a capacity to sorb carbon monoxide that was only 11 percent greater than the capacity of ST 707 to sorb carbon monoxide. Sandrock Testimony at 6–7.

The Court accepts Dr. Ferrario's testimony that these differences in particle size,

---

7. Pyrophoricity is a measurement of the capacity of a substance to react to air, and, thus, to burn easily. It is measured by testing the flash point of a given substance. Declaration of Dr. Bruno Ferrario ("Ferrario Dec.") at 8; Sandrock Testimony at 186.

8. ST 707 has the following nominal composition: zirconium, 70%; vanadium, 24.6%; and iron, 5.4%. Declaration of Tiziano Giorgio at 3.

9. Experiments conducted by Saes show separate samples of HY STOR 405 having flash points of 374°C and 394°C, and samples of ST 707 having flash points of 402°C and 395°C. Ferrario Declaration at 7.

10. While Dr. Sandrock disputed the validity of the figures comparing the flash points of a vanadium-zirconium compound with that of ST 707 and HY STOR 405 on various grounds, defendant offered no experimental data substantiating a contrary finding. Sandrock Testimony at 183–84, 187. Indeed, Dr. Sandrock's only support for his contention that manganese increased the pyrophoricity of a vanadium-zirconium compound was purely anecdotal. Sandrock Testimony at 188.

porosity, and degree of compression also account for most of the claimed differences in capacity to sorb hydrogen. Moreover, it is clear from the testimony of Mr. DaCosta that, in terms of practical application, both ST 707 and HY STOR 405 have more than ample hydrogen capacity to serve their intended purposes. Testimony of Mr. DaCosta, March 17, 1992 at 102–03. Thus, any slight increase in hydrogen capacity that HY STOR 405 might display does not constitute a substantial advantage in practical terms.

Likewise, as to the compounds' capacity to sorb oxygen, Dr. Ferrario's tests disclosed that, in a twenty-minute period, samples of HY STOR 405 sorbed between 91.7 and 93.3 percent of oxygen, while a sample of ST 707 sorbed between 90.2 and 91.8 percent of oxygen. Defendant's Bench Book of Exhibits ("Defendant's Exhibit"), Exhibit 9; Ferrario Dec. at 7. The industry-established margin of error for such tests is plus/minus 15 percent. Ferrario Testimony at 37. Given such a margin of error, and in view of the above, this Court is satisfied that both compounds obtain substantially similar results in the sorption of oxygen.[11]

The Court finds that the evidence presented establishes that HY STOR 405 performs substantially the same overall function, in substantially the same way, to achieve substantially the same over-all result as the Boffito patent. This is not to say that the processes are identical in performance, for they are not. HY STOR 405 shows a somewhat greater capacity to sorb oxygen-containing gases. Substantial equivalence, however, does not require identity in performance. Indeed, it is well established that where the significant features of a patent have been appropriated, infringement will be found even if sufficient modifications have been made to justify a patent for the improvement. *Atlas Powder Co. v. E.I. Du Pont De Nemours,* 750 F.2d 1569, 1580 n. 3 (Fed.Cir.1984) (equivalence does not require

that the claimed invention and accused product have identical results; the results can be substantially the same and the accused product can be an improvement).

Here, it would have been obvious to one reasonably skilled in the art at the time HY STOR 405 was developed,[12] that manganese, in small amounts, could substitute for iron in the Boffito process and, thereby, enable the user to obtain equivalent results. *See* Sandrock Testimony at 193–96.

In reaching its conclusion, the Court notes that the Boffito patent is a pioneering patent. Indeed, Dr. Sandrock conceded as much in his testimony. *See* Sandrock Testimony at 126. As Judge Ackerman noted: "A greater degree of protection is afforded to pioneer inventions and a broader range of equivalents will be held to infringe." *Saes Getters, S.P.A. v. Ergenics, Inc.,* 15 U.S.P.Q.2d at 1215 (*citing Continental Paper Bag Co. v. Eastern Paper Bag Co.,* 210 U.S. 405, 414–15, 28 S.Ct. 748, 749–50, 52 L.Ed. 1122 (1908)). Thus, the Boffito patent is entitled to this greater degree of protection. Even without such heightened protection, however, the Court would conclude that HY STOR 405 is equivalent to the Boffito process.

Even where the accused process is found to be equivalent to a patented process, there is no infringement if the breadth of the claimed equivalence would be invalid, either for obviousness or anticipation, in light of the prior art. *Wilson Sporting Goods Co. v. David Geoffrey & Assoc.,* 904 F.2d 677, 683 (Fed.Cir.1990). This prevents a patent holder from obtaining protection under the doctrine of equivalents that is broader than the protection that the patent holder could have lawfully obtained from the Patent Office by literal claims. *Id.* at 684. The *Wilson* Court suggested that the determination of infringement be made by:

visualizing a hypothetical patent claim, sufficient in scope to literally cover the ac-

---

11. Defendant contends that plaintiff's tests for oxygen sorption should have focused on final pressure rather than on the percentage of oxygen gettered. Defendant's expert, Dr. Sandrock, however, agreed that both measurements were "equally meaningful." Sandrock Testimony at 223.

12. It is not a requirement of equivalence that those skilled in the art know of the equivalences when the patent application is filed or when the patent issues; rather, they must know of the equivalences at the time that the infringement takes place. *See Atlas Powder,* 750 F.2d at 1581.

cused product. The pertinent question then becomes whether that hypothetical claim could have been allowed by the [Patent and Trademark Office] over the prior art. If not, then it would be improper to permit the patentee to obtain that coverage in an infringement suit under the doctrine of equivalents. If the hypothetical claim could have been allowed, then prior art is not a bar to infringement under the doctrine of equivalents.

*Id.* at 684.

In this case, Saes offers as its hypothetical claim claim 3 of the patent, modified to define the getter as a combination of zirconium, vanadium, and at least one transition metal such as iron, nickel, or manganese.

Prior to the evidentiary hearing on March 17 and March 18, 1992, defendant contended that this hypothetical patent was rendered obvious by certain prior art.[13] During the evidentiary hearing, the parties were advised that the Court intended to adhere to Judge Ackerman's prior determination that Boffito describes a gettering process which, by definition, includes the capacity of the getter to rapidly sorb various gases at low pressure. *See* 17 U.S.P.Q.2d at 1587. Thus, the Court made clear its view that prior art failing to disclose the capacity of a compound to sorb gas at low pressures or the ability to sorb gases other than hydrogen could neither anticipate nor render obvious Boffito's claims.[14]

In view of this determination, Ergenics no longer presses its contention that Saes's hypothetical claim would be obvious in light of the prior art.[15] This concession is proper, as none of the cited prior art refers to a gettering process capable of sorbing *various* gases, at *low* pressure, with *low* temperature activation. Thus, the Court finds that plaintiff has shown a substantial likelihood of success on the merits.

### B. *Irreparable Harm*

■■■■ Where validity and continuing infringement have been clearly established, irreparable harm should be presumed. *Smith International, Inc. v. Hughes Tool Co.,* 718 F.2d 1573, 1581 (Fed.Cir.1983). Ergenics argues, however, that Saes's own inaction in pursuing its claim rebuts this presumption. The Court disagrees.

While it is true that there was some delay in seeking a preliminary injunction against the selling and manufacturing of HY STOR 405, Saes explains that the delay was largely precipitated by counsel's awareness of this Court's calendar congestion. The Court is in a unique position to appreciate plaintiff's concern and finds that counsel's explanation is an eminently reasonable one. Moreover, the Court finds that Saes has not been dilatory in pursuing its rights; this is the third preliminary injunction sought by plaintiff in an effort to deter a defendant apparently determined to appropriate Saes's patented process. To suggest that Saes has been less than diligent in pursuing its rights is, under the circumstances, a frivolous argument. Therefore, the Court concludes that plaintiff has demonstrated irreparable harm.

### C. *Equitable Considerations*

■■■ Equitable factors also may be considered in deciding whether an injunction should issue. Ergenics argues that the issuance of an injunction would put it out of the gettering business. In support of this contention, Ergenics offers Mr. DaCosta's wholly conclusory testimony that fails to explain why or how a preliminary injunction would have such an effect. Apparently, Ergenics made a similar argument before Judge Ackerman in connection with the HY STOR 402 preliminary injunction. Ergenics claimed that the injunction would put it out of business, but proffered no evidence in support of its claim. *See* 17 U.S.P.Q.2d at

---

13. Such prior art includes the Della Porta patent, Defendant's Trial Exhibit 15, a British patent, Defendant's Exhibit 16, and a paper, authored in part by Daniel Shaltiel, Defendant's Trial Exhibit 22.

14. Although the Court regarded itself as bound by Judge Ackerman's determination, the Court notes that no evidence was proffered, at either

the evidentiary hearing, or in connection with plaintiff's motion for summary judgment on validity, which is also pending before the Court, that would warrant a contrary conclusion.

15. Ergenics, however, has reserved the right to pursue the issue on appeal or at a trial on the merits.

1590. Given the fact that Ergenics still appears to be in business, defendant's claim of impending business catastrophe is afforded little weight.

In favor of granting a preliminary injunction is the fact that here, as in the earlier proceedings before Judge Ackerman, it appears that defendant, once again, deliberately set out to copy plaintiff's invention and incorporate minor deviations to avoid infringement. *See* 17 U.S.P.Q.2d at 1589.

### V. CONCLUSION

For the reasons set forth above, the Court concludes that plaintiff has established a substantial likelihood of success on the merits and has demonstrated that irreparable harm result if an injunction did not issue. Defendant shall be preliminarily enjoined from selling the gettering process accused of infringing plaintiff's patent, namely, HY STOR 405. Plaintiff shall be required to post a $125,000.00 bond in support of this injunction. An appropriate Order shall issue.

### ORDER

This matter having come before the undersigned on plaintiff's application for a preliminary injunction prohibiting defendant Ergenics, Inc. from infringing United States Patent Number 4,312,669 (the "Boffito patent"); and the parties having consented to have plaintiff's application heard and decided by the undersigned; and this matter having been referred to the undersigned by the Honorable Harold A. Ackerman; and the Court having considered the written submissions of the parties and the oral arguments of counsel; and for the reasons expressed in the Opinion issued this same date;

IT IS on this 15th day of June, 1992,

ORDERED THAT plaintiff's application for a preliminary injunction be, and hereby is, GRANTED; and it is further

ORDERED THAT defendant be, and hereby is, enjoined from selling and/or manufacturing for sale the gettering process HY STOR 405, which is claimed to infringe the Boffito patent; and it is further

ORDERED THAT plaintiff shall post a bond in the amount of $125,000.00 in connection with its request for a preliminary injunction.