**INSITUFORM OF NORTH AMERICA, INC., et al., Plaintiffs,**

v.

**MIDWEST PIPELINERS, INC., et al., Defendants.**

Civ. A. No. C–3–91–251.

United States District Court, S.D. Ohio, W.D.

Dec. 13, 1991.

---

Edwin M. Baranowski, Jonathan Hollingsworth, Juan Chardiet, Porter, Wright, Morris & Arthur, Dayton, Ohio, for plaintiffs.

Charles J. Faruki, Faruki, Gilliam & Ireland, Dayton, Ohio, Susan Knoll, Michael Amerson, Arnold, White & Durkee, Houston, Tex., for defendants.

## MEMORANDUM OPINION AND DECISION

MICHAEL R. MERZ, United States Magistrate Judge.

This is an action for patent infringement. Plaintiffs seeks injunctive and declaratory relief and money damages; by counter-claim, Defendants seek a declaration of invalidity and noninfringement. The parties agreed to try the issue of infringement first, and that issue came on for trial December 2 through 6, 1991, before United States Magistrate Judge Michael R. Merz, sitting without a jury and pursuant to 28 U.S.C. § 636(c).

This Court has exclusive jurisdiction of the subject matter of this action by virtue of 28 U.S.C. § 1338(a). Venue is proper in this district. Both parties have reserved the right, following a determination on the infringement issue, to request the Court to determine whether this case is exceptional under 35 U.S.C. § 285.

The Court's findings of fact and conclusions of law, as required by Fed.R.Civ.P. 52(a), are embodied in the following opinion.

## UNCONTROVERTED FACTS

Plaintiff Insituform of North America, Inc., (INA) is a Delaware corporation having its principal place of business in Memphis, Tennessee. Plaintiff Insituform East, Inc., (East) is a corporation and a non-exclusive licensee of INA in the United States.

Defendant Midwest Pipeliners, Inc. (Midwest) is a Delaware corporation having its principal place of business in Columbus, Ohio. Defendant United Survey, Inc. (United) is an Ohio corporation having its principal place of business in Cleveland, Ohio.

The parties to this litigation are generally involved in the business of relining underground pipelines, such as sewer lines, without the necessity of excavating the pipelines. This process is generally known as trenchless pipe rehabilitation and involves installing a liner made of plastic-like material to the inside of a pipeline throughout its length. Typically a number of smaller pipes or "laterals" from various sources, such as residences and businesses, feed into the pipeline. The installed liner covers the openings from the laterals into the pipeline and it is necessary to reestablish or reinstate these openings by cutting

a hole in the liner at the location of the lateral opening. PX 1, Col. 1.[1]

The principal customers for trenchless pipe rehabilitation are municipalities. Midwest and East compete directly with one another for municipal contracts for this work.

On April 15, 1980, the United States Patent & Trademark Office issued U.S. Patent No. 4,197,908, entitled "Apparatus For Porting a Side Wall of a Conduit from Interiorly Thereof" (the '908 patent) to inventors Edward M. Davis and Richard A. Bowie. The '908 patent was initially assigned to Underground Surveys Corp. PX 1. INA acquired the '908 patent in 1986 and has the right to recover for infringement thereof. East is a non-exclusive licensee of INA to the "Insituform®" system of relining pipelines and conduits and has no ownership in the '908 patent.

The application for the '908 patent, U.S. Patent Application Serial No. 894,122, was filed on April 6, 1978. PX 2. The general subject matter of the '908 patent is a device useful in cutting lateral side openings or "ports" in the liner sidewalls of relined pipelines and conduits. PX 1.

Plaintiffs contend that Defendants Midwest and United infringed the '908 patent during a sewer pipe relining project conducted in Oakwood, Ohio, a suburb of Dayton, in 1990 (the "Oakwood Project"). The Oakwood Project involved the relining of sewer lines and the cutting of ports for "laterals" in the liner of the relined pipe. East submitted the second lowest bid on the Oakwood Project, the lower bidder being Midwest, which was awarded the project contract.

In Defendants' system for cutting ports for laterals in a relined pipe, which they used on the Oakwood Project, a cutting tool powered by a pneumatic motor and an adjacent camera are positioned within the pipe at the location at which the port for the lateral is to be cut. The tool is controlled by an operator at a remote station which is normally located in a truck so that the system can be readily transported. At the station, the operator views the section of the relined pipe at the location of the lateral on a video monitor. The screen displays images of the pipe interior that are originated by the camera within the pipe. Thus, the operator can simultaneously view the pipe section of interest, the tool, and the tool's operation. PX 8.

Then, at the location at which the lateral is to be cut, the operator engages the tool with the liner of the relined pipe by remote control to cut the port in the liner and reconnect the lateral with the relined pipe. The cutting operation is displayed to the operator on the television screen. PX 8.

Plaintiff INA contends Defendants' system for cutting laterals infringes Claims 11 and 13 of the '908 patent.

Claim 11 of the '908 patent reads as follows:

11. An apparatus for laterally porting a tubular liner for a passageway, which passageway has laterals sealed over by the liner, which laterals it is desired to connect in fluid communication with the interior of the liner, comprising:

A. a carriage;

B. means mounting the carriage for movement longitudinally of the liner;

C. travel control means connected to the mounting means adapted to start and to stop movement of the carriage operable from a control station remote from the carriage;

D. a television system including a camera mounted on the carriage disposed to view the interior of the liner and a screen at the control station for displaying the interior of the liner as viewed by the camera;

E. a cutting tool;

F. a pneumatic motor having driving connection to the tool and having an exhaust port;

G. means mounting the tool on the carriage for reciprocal positioning between a position engaged with the lin-

---

1. Plaintiffs' Exhibits are designated "PX"; Defendants' are designated "DX"; Joint Exhibits are designated "JX."

er within the view of the camera extended from the carriage transversely of the liner and a retracted position;

H. tool control means connected to the tool mounting means operable from the control station selectively to position the tool in its extended and retracted positions; and

I. a duct connected to the exhaust port of the motor having an outlet directed toward the conduit engaging position of the tool to blow debris resulting from operation of the tool therefrom.

PX 4.

Claim 13 of the '908 patent is as follows:

13. A conduit side wall porting apparatus comprising:

A. a carriage;

B. means for positioning the carriage longitudinally internally along such a conduit to successive porting positions;

C. a port forming tool mounted on the carriage for adjustable movement to and from a conduit engaging position;

D. a pneumatically driven motor connected to the tool having an intake and an exhaust with said exhaust being directed toward said conduit engaging position, and

E. a source of gas under pressure connected to the intake for passage of the gas through the motor and out the exhaust to said conduit engaging position to blow debris resulting from operation of the tool therefrom.

PX 5.

Except as otherwise provided in Title 35 of the United States Code, whoever without authority makes, uses, or sells any patented invention within the United States during the term of the patent therefor, infringes the patent. 35 U.S.C. § 271(a).

Plaintiff INA alleges infringement of claims 11 and 13 of the '908 patent by Defendants' use of a particular cutter apparatus;[2] Defendants neither manufacture nor sell the allegedly infringing cutter apparatus, but have acquired it from its Danish manufacturer, Belecha, which markets it under the name of The Beaver® Cutter System. PX 12.

Defendants have used two versions of a cutter apparatus for cutting ports for laterals in various relining projects: (1) an original or unmodified version (the "accused apparatus") and (2) a modified version of the cutter apparatus.

Plaintiffs admit that the modified version of the cutter apparatus used by Defendants, which has the exhaust of the motor directed away from the conduit engaging position of the tool, does not infringe the '908 patent, either literally or under the doctrine of equivalents.

Defendants had no knowledge of the '908 patent until Plaintiffs initiated this lawsuit. Plaintiffs knew at least as early as August, 1990, of Defendants' use of the accused apparatus.

## APPLICABLE GENERAL PRINCIPLES OF LAW

Patent infringement must be proved by a preponderance of the evidence. *Rite–Hite Corp. v. Kelley Co.*, 819 F.2d 1120, 1123 (Fed.Cir.1987); *Hughes Aircraft v. United States*, 717 F.2d 1351, 1361 (Fed. Cir.1983).

To prove literal infringement, the patent owner must show that an accused device comes within the scope of the asserted claims, as properly interpreted. *Envirotech Corp. v. Al George, Inc.*, 730 F.2d 753, 758 (Fed.Cir.1984). *Graver Tank & Mfg. Co. v. Linde Air Products*, 339 U.S. 605,

2. In Insituform's Reply to Defendants' Trial Memorandum Regarding "Capability to Infringe" Doctrine (Doc. # 47), Plaintiff Insituform argues the trial evidence supports a finding that Midwest "makes" the accused device by replacing worn out air motors in the device with new air motors removed from Uryu grinders of the type exemplified by PX 18. This was not an issue made up for trial by the Final Pretrial Order, which governs the future conduct of the action. Thus no further consideration is given to that claim here. In any event it is clear that all Midwest has done is to replace the original air motor with an exact duplicate of the one used by the original equipment manufacturer, but available much less expensively in Columbus, Ohio, where Midwest is located, than from Denmark.

607, 70 S.Ct. 854, 855, 94 L.Ed. 1097 (1950). To establish infringement of a patent, every limitation set forth in a claim must be found in an accused product or process exactly or by a substantial equivalent. *Johnston v. IVAC Corp.*, 885 F.2d 1574, 1577 (Fed.Cir.1989). "Literal infringement requires that the accused [device] embody every limitation of the asserted claims." *Hi–Life Products, Inc. v. American National Water–Mattress Corp.*, 842 F.2d 323, 325 (Fed.Cir.1988).

■ Under 35 U.S.C. § 282, each claim of a patent is a separate definition of the invention and is presumed valid independently of the validity of other claims. To determine infringement, the Court must first properly construe the claims to determine their scope and then decide whether the properly interpreted claims encompass the accused device. *ZMI Corp. v. Cardiac Resuscitator Corp.*, 844 F.2d 1576, 1578 (Fed.Cir.1988). The first step, claim construction, is a question of law; the second step, whether the properly interpreted claim encompass the accused device, is a question of fact. *Hormone Research Foundation, Inc. v. Genentech*, 904 F.2d 1558, 1562 (Fed.Cir.1990), *cert. dismissed,* — U.S. —, 111 S.Ct. 1434, 113 L.Ed.2d 485 (1991); *Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d 861, 866 (Fed.Cir.1988); *McGill, Inc. v. John Zink Co.*, 736 F.2d 666, 673–75 (Fed.Cir.), *cert. denied,* 469 U.S. 1037, 105 S.Ct. 514, 83 L.Ed.2d 404 (1984).

■ A patent claim is construed in light of its language, the other claims, the prior art, the prosecution history, and the specification, and not in the light of the accused device. *SRI International v. Matsushita Electric Corp.*, 775 F.2d 1107, 1118 (Fed.Cir.1985). The words of a claim are to be given their plain and ordinary meaning in the art, unless the patentee has chosen to give a word a special definition. *Envirotech Corp. v. Al George, Inc.*, 730 F.2d 753, 759 (Fed.Cir.1984); *Fromson v. Advance Offset Plate, Inc.*, 720 F.2d 1565, 1569 (Fed.Cir.1983), *aff'd in part, rev'd in part,* 755 F.2d 1549 (Fed.Cir.1985). A patentee can, however, choose to be his own

lexicographer and give a word a special meaning. *Loctite Corp.*, 781 F.2d at 866. Claims should be construed as they would be by those skilled in the art. *Id.*

■ Once an interpretation of a claim has been made, that same interpretation must be employed in determining literal infringement and infringement under the doctrine of equivalents. *Senmed, Inc. v. Richard–Allan Medical Industries, Inc.*, 888 F.2d 815, 818 (Fed.Cir.1989). Words defined in the specification should be given the same meaning in the claims. *McGill, Inc. v. John Zink Co.*, 736 F.2d 666 (Fed. Cir.1984).

■ The doctrine of equivalents is an equitable doctrine applied by federal courts to prevent an infringer from evading patent claims and appropriating the benefit of the patented invention by arguing "technical" exceptions to the literal meaning of patent claims. Under the doctrine of equivalents, an accused device that does not literally include every element of a claim will be found to infringe if the accused device nevertheless performs substantially the same function in substantially the same way to obtain substantially the same result as the claimed invention. *Graver Tank v. Linde Air Products*, 339 U.S. 605, 608–10, 70 S.Ct. 854, 856–57, 94 L.Ed. 1097 (1950); *Hughes Aircraft*, 717 F.2d at 1361. The equivalence of an accused device with the subject matter defined by the patent claims is an issue of fact. *Graver Tank*, 339 U.S. at 609, 70 S.Ct. at 856; *D.M.I., Inc. v. Deere & Co.*, 755 F.2d 1570, 1575 (Fed.Cir.1985).

However, the doctrine of equivalents should not be used in such a manner as to render the language of the patent claims meaningless:

Application of the doctrine of equivalents is the exception, however, not the rule, for if the public comes to believe (or fear) that the language of the patent claims can never be relied on, and that the doctrine of equivalents is simply the second prong of every infringement charge, regularly available to extend protection beyond the scope of the claims, then claims

will cease to serve their intended purpose. Competitors will never know whether their actions infringe a granted patent.

*Wallace London and Clemco Products, Inc. v. Carson Pirie Scott & Co.*, No. 91–1189, 946 F.2d 1534 (Fed.Cir.1991).

 Infringement *may* be found under the doctrine of equivalents if an accused product performs substantially the same function in substantially the same way, to obtain the same overall result as the claimed invention. *Wilson Sporting Goods v. David Geoffrey & Associates*, 904 F.2d 677, 683 (Fed.Cir.1990). Even if this test is met, however, there can be no infringement if the asserted scope of equivalency of what is literally claimed would encompass the prior art. *Id.* The doctrine of equivalents exists to prevent a fraud on a patent ... not to give a patentee something which he could not lawfully have obtained from the PTO had he tried. Thus, since the prior art always limits what an inventor could have claimed, it limits the range of permissible equivalents of a claim. *Id.* at 684.

## OPINION

Plaintiffs allege that Defendants have infringed the '908 patent by using the cutter apparatus shown in PX 17.

The unmodified and accused cutter used by the Defendants employs both a remotely controllable cutting unit and a camera unit for viewing the cutting operations. In operation, the cutting unit is positioned at the lateral connection to be opened. The cutting unit is used to remove portions of the liner within the opening of the lateral and is operated by viewing the cutting unit through the TV/camera system.

The cutter unit is operated remotely by a control panel kept in a van. Operation of the cutter is observed on a TV screen also located in the van near the control panel. The operator controls the cutter and makes the opening for the lateral by viewing the lateral on the TV screen.

While the cutter is in operation, it is critical that the lens on the camera unit remains clean. The operator must be able to view the lateral and operation of the cutter in order to properly reopen the lateral connection.

The cutter unit has a cutting tool attached to a pneumatic motor; pairs of arms that permit the tool to be lifted up and down; a mechanism to allow for rotation of the air motor and cutting tool; a cylindrical housing that contains electronic control mechanisms and motors; cables; a bladder that is inflated to secure the tool in the pipe; electrical connections and connections for the air source for the motor. DX AJ.

The cutter unit used by Defendants at Oakwood had only a housing and was not mounted on skids. DX AK–2; DX AJ.

Air from a compressor on the surface is supplied to the motor through an air hose. Air travels through the air motor at approximately 56 cubic feet per minute (cfm). Air enters the motor and causes a turbine or vane inside the housing to rotate which in turn cause rotation of a shaft upon which the cutting tool is attached.

The pneumatic motor of the accused cutter unit is always driven by air from a compressor, not by using a separate "source of gas under pressure."

The air is exhausted through an opening in the housing of the air motor which is perpendicular to the cutting tool. DX A.

The opening in the housing of the air motor is fitted with an exhaust cap. The exhaust cap has a one-way valve which is open when air pressure is applied. The exhaust cap having the one-way valve is secured to the air motor housing with a bolt which passes through the center of the cap. PX 10 A.

This motor is manufactured by a Japanese concern and originally incorporated by the Danish manufacturer of the Beaver® Cutter into that cutter without modification. The air motor can be purchased in the United States as part of a grinder, an exemplar of which is PX 18. Midwest has purchased several such grinders from an equipment dealer, Zura & Sons, in Columbus, Ohio, and "cannibalized" them for the air motor, which can be removed from the

grinder and used in the Beaver® Cutter without modification.

Defendants have used cutting units with the air motor having two versions of an exhaust cap. Both versions attach to an extension of the exhaust on the housing by means of a screw which extends through the axis of the cap into a threaded receptacle milled in the body of the motor. In the original or unmodified version, the exhaust cap has two ports through which the air from the motor is discharged. DX A. Plaintiffs allege that the cutting unit having this "unmodified" exhaust cap infringes claims 11 and 13.

Midwest used the allegedly infringing cutter on approximately eight jobs over the period of May, 1990, through July, 1991. United used the allegedly infringing cutter on three jobs during that same time period.

Defendants have used the allegedly infringing, unmodified cutter in small diameter pipe. When used in small diameter pipe, the cutting unit is placed in the relined pipeline by pulling the cutting unit through the pipe on its cylindrical housing. The cutting unit does not have legs or skids attached to the cylindrical housing.

Defendants have only operated the pneumatic motor with compressed air supplied by an air compressor at approximately 125 pounds per square inch to drive the cutting tool.

Since July 1991, Defendants have used a modified exhaust cap. Plaintiffs admit that the cutter having the modified exhaust cap does not infringe the '908 patent. The admittedly non-infringing modified cutter has two 4″ to 5″ exhaust ducts welded to the ports of the exhaust cap. These exhaust ducts extend longitudinally down the body of the cutter, rotated 180° away from the video camera. This modification is now being made to the air motor by the manufacturer and current models of the Beaver® Cutter are being shipped with the modified exhaust.

■ Defendants assert that the accused device does not infringe the '908 patent because it does not have the following elements:

1. A "carriage" as required by elements A, B, C, D, and G of Claim 11 and elements A, B, and C of Claim 13;

2. A "duct connected to the exhaust port of the motor" as required by element I of Claim 11; or

3. An "exhaust directed toward [the] conduit engaging position [of the cutting tool]" (Claim 13) or "outlet directed toward the conduit engaging position of the tool" (Claim 11).

Plaintiffs counter that the accused device has each of these elements when viewed in light of a proper construction of Claims 11 and 13.

The phrase "conduit engaging position" as used in the disputed claim elements means the point where the cutting tool of the device contacts the relined pipe.

A review of the prosecution history of the '908 patent shows that issued claim 11 derived from originally filed claim 13. PX 2. Original claim 13 was rejected by the patent examiner in the first office action due to prior art, U.S. Patent No. 3,175,392 to Tharalson, et al. PX 2; DX U.

Original claim 13 was an independent claim and did not include the limitation of a pneumatic motor having the exhaust of the air motor directed toward the conduit engaging position of the tool to blow debris resulting from the operation of the tool therefrom. PX 2. The examiner indicated in the first office action that the subject matter of dependent claim 14 would be allowed if rewritten in independent form. Dependent claim 14 contained the express limitations of having a duct connected to the pneumatic motor exhaust and the exhaust directed toward the conduit engaging position of the tool to blow debris resulting from operation of the tool therefrom. PX 2.

In the amendment filed June 11, 1979, and in response to the examiner's rejection, the applicants for the '908 patent incorporated the limitations of dependent claim 14 in paragraph I of issued claim 11. PX 2. They also included a new claim, 16, which became issued claim 13. PX 2. In that claim they added the limitations previously

suggested by the examiner to be allowable subject matter, i.e., the pneumatically driven motor having the exhaust directed toward the conduit engaging position and a "source of gas under pressure." PX 2 (see original dependent claims 3 and 15). These limitations are found in paragraphs D and E of issued claim 13. PX 2. After the limitations were incorporated into the independent claims, the examiner allowed the claims to issue. PX 2.

The deposition of one of the inventors, Richard A. Bowie, was introduced as evidence at trial. Mr. Bowie was examined about the meanings of various terms in the '908 patent. He initially stated that the carriage was an assembly that includes legs and skids, as well as a frame. Bowie Deposition, p. 75–76. He also indicated that there are two distinct individual carriages, one for the television camera and one for the cutter, which are joined by a chain. Bowie Deposition, p. 69; 79–80.

With respect to the function of the legs of the carriages, Mr. Bowie testified that "the angle of these legs is critical in determining or designing the device to stay centered and stay upright in the pipe." Bowie Deposition, p. 23.

Mr. Bowie agreed that the '908 patent specification and drawings referenced only the legs and skids of the television camera and the cutter units and that the '908 patent did not include within its definition of the carriage the housing or frame. Bowie Deposition, p. 85–86. According to him, the "housing" is shown on Figure 1 (reference numeral 49) and is a sealed protective cylinder that houses the drive motors and electronic controls. Bowie Deposition, p. 75.

With respect to element I of claim 11, Mr. Bowie understood the duct as described in the claim to be a passageway routing the exhaust of the air motor, expended air or gas at the location of the cutting tool in order to facilitate cooling of the tool, or in the case of inert gas to express any tendency to spark and cause a fire, and to blow away the debris that is incurred in the cutting process. Bowie Deposition, p. 84.

Referring to Figure 8 of the '908 patent, in particular numeral 170, Mr. Bowie understood 170 to be a pipeline or a piece of tubing that is connected somewhere around the exhaust area of the motor. Further, as to the discharge 171, Mr. Bowie stated "[f]or the air to exhaust here, it would blow all of the debris right in the lens of the camera. This is not correct. It can't be put together like this. I don't believe the 171 was ever used on this device." Bowie Deposition, p. 72.

As to claim 13, Mr. Bowie stated regarding paragraph D:

A: [i]ts making the statement that the expended air from the air motor is routed through a conduit and directed at the location of the cutter.

Q: And you told me earlier that wouldn't work?

A: Not in the configuration that's shown here. The first thing you do when you turn it on is you blow all the debris in the face of the camera and it's obvious, you don't have to be a rocket scientist to figure that out.

Bowie Deposition, p. 90.

### "CARRIAGE"

■ While the preferred embodiment described in the patent does not limit the claims, it is perfectly proper to look at the specifications to determine the meaning of words used in the claims. *SRI International*, 775 F.2d at 1118. With respect to the disputed carriage element, the inventors described the carriage of the preferred embodiment as follows:

The work unit 36 and the inspection unit 37 are supported on a carriage 54. The carriage for the *work unit* includes a pair of rearward legs 55 radially extended from the rearward end plate 44 and a forward pair of legs 56 radially extended from the forward bearing plate 47. Corresponding legs of the pairs of legs 55 and 56 are mounted on skids 57. The legs 55 and 56 support the hood 45 and the housing 49 on the skids in substantially parallel relation thereto. (Column 3, lines 48–56).

\* \* \* \* \* \*

Referring again to FIG. 1, it will be seen that the *inspection unit* 37 has a cylindrical housing 188 supported concentrically of the conduit 10 on legs 189 supported on skids 190 similar to the skids 57 previously described. The legs preferably take the form of the legs 55 and 56 consisting of replaceable bolts, not shown, circumscribed by spacers 171 which can be replaced so as to adjust the viewing or inspection unit 37 concentrically of the conduit 10. A chain 195 interconnects the forward ends of the skids 190 with the rearward ends of the skids 57. The skids 57 and 190, interconnecting chain 195, and legs 55, 56 and 189 constitute the carriage 54 for the apparatus.

(PX 1, Column 6, lines 36–48, emphasis added).

Richard Kilworth, Defendants' patent law expert witness, testified that, based on this language, the inventors meant the carriage to be the housing (of the motor for positioning the cutting tool) plus something else to support that housing. I conclude this interpretation is correct.

Plaintiffs assert the accused device has a carriage which consists of the housing alone, particularly since the accused device seems to have (see PX 17) a slightly enlarged circumference at either end of the housing. It is difficult to see how that enlarged housing would perform the same function suggested by the word "carriage." The plain and conventional meaning of that word, as suggested by Plaintiff's proffered dictionary is "7. a wheeled frame or support for something heavy (a gun *carriage*); 8. a moving part (of a machine) or supporting and shifting something (the *carriage* of a typewriter)" (PX 11 at 215).

I conclude that the accused device does not infringe Claim 11 or Claim 13 literally because it does not have a carriage such as is required by those claims.

### "DUCT"

The accused device also does not have a "duct" as is required by element I of Claim 11.

The conventional or dictionary definition of "duct" is "1. a tube, channel, or canal through which a gas or liquid moves." PX 11 at 419.

The air motor is exhausted internally into a cavity in the housing approximately 1″ deep and 1½″ in circumference. (Measurements were made on PX 18 since none of the witnesses at trial was able to remove the exhaust cap from DXA by hand. The evidence establishes they are identical.) The cap extends ½″ beyond the housing. The wall of the cap is less than ¼″ thick. The cap is 1½″ in diameter. The ports occupy approximately ⅓ of the circumference of the cap.

Observing these dimensions, Defendants' expert engineering witness, Frank Gilleland, testified that air passing from the motor exhaust through the housing cavity and out the two ports would not obey standard engineering laws describing the behavior of fluids in conduits or ducts. No testimony contradicting Mr. Gilleland was offered.

"Duct" does not appear in the patent specifications, but the inventor described the preferred embodiment as follows:

The [pneumatic] motor 166 has an exhaust 169 through which air or gas used to drive the motor is expelled. A conduit 170 is connected to the exhaust, extended alongside of the motor and provided with a discharge 171 directed at the tool [71]. Whenever the motor is being pneumatically driven, air or gas is discharged on the tool *71* to cool the same, to blow debris away caused by tool operation, and, when inert gas is used by opening valve 25 and closing 24, to quench any sparks resulting from tool operation.

(PX 1, Column 6, lines 20–29, emphasis added).

\* \* \* \* \* \*

Further, whether the inert gas from the source 22 or compressed air from the compressor 21 or a combination thereof is utilized, the exhaust from the motor 166 is directed by the conduit 170 so as

to blow away debris caused by the cutting action.

(*Id.*, Column 10, lines 30–34).

This arrangement is depicted in Figures 2, 3, 8 and 9 of the '908 patent. Certainly the conduit depicted there is a duct within the meaning of Claim 11, element E; the passageway formed by the air motor housing, the inside of the exhaust cap, and the two ports is not.

## "OUTLET OR EXHAUST DIRECTED AT THE CONDUIT–ENGAGING POSITION OF THE TOOL"

The real heart of the controversy between the parties is whether the accused device has an "outlet or exhaust directed at the conduit-engaging position of the tool."

Claims 11 and 13 of the '908 patent require that the exhaust from the pneumatic motor of the cutter apparatus be "directed toward the conduit engaging position to blow debris resulting from operation of the tool therefrom."

In the specification of the '908 patent, the pneumatic motor is described as having:

[a] conduit 170 [that] is connected to the exhaust, extended alongside the motor and provided with a discharge 171 *directed at the tool.* (emphasis added). the motor is being pneumatically driven, air or gas is discharged *on the tool* 171 to cool the same, to blow away debris caused by tool operation, and, when inert gas is used ... to quench any sparks resulting from tool operation. *See* Column 6, lines 22–29 (emphasis added). the exhaust from the motor "is discharged through the conduit 170 *into the area of operation of the tool 71.* ..." *See* Column 10, lines 26–27 (emphasis added).

Based upon the ordinary meaning of the words, and the teachings of the '908 patent, the Court finds that the phrase "directed toward the conduit engaging position of the tool to blow debris resulting from operation of the tool therefrom" means that the exhaust from the pneumatic motor is discharged *directly at* the point where the cutting tool of the device contacts the re-lined pipe. The phrase does not encompass a device that does not have the exhaust purposefully directed at the point where the tool engages the conduit.

The controversy arises because the exhaust cap as it comes on the grinder (PX 18) and as it was shipped as part of the Beaver® Cutter is rotatable through 360° around the axis of its affixing screw.

By convention during the trial, witnesses described various possible positions of the cap by reference to a hypothetical clock such that if a line were drawn parallel to the affixing screw, tangent to the circumference of the cap, and bisecting the portion of the cap separating the two ports, the direction of that line toward the bottom of the housing would be "6:00" and the opposite direction be "12:00."

Both Mr. Whisenhunt and Mr. Kilworth, patent law experts for the two sides, agreed that the accused device is not infringing if the cap is rotated to the 3:00 position. Because of the width of the two ports, Mr. Whisenhunt concluded the cutter would be infringing with the cap located anywhere between approximately 11:00 and 1:00.

It is impossible to eliminate all effluent from sewers in which lateral reinstatement is being done. Because of this there is usually water in the bottom of the sewer pipe in which Defendants are working. In addition, the air motor must be continually lubricated with a mixture of penetrating and chain-saw oil which is introduced at the air coupling on the rear of the device and then blown through the motor with compressed air.

Interpretation of the television image is the key to success with this relining system. United Survey's President, Mr. Tartabini, who has been in the television sewer inspection business since long before this relining technology was developed, testified it takes about a year's experience for an operator to become sufficiently acclimated to what he is seeing to be able to interpret the images accurately. Precision is important because contracting municipalities insist on guarantees.

In order to interpret the image accurately, the operator must first have a clear image. Lubricating oil from the air motor or water or other contents of the effluent, particularly phosphates from cleaning products, can quickly obscure the camera lens. When this happens, the entire unit must be removed from the sewer and cleaned; there is as yet no process for cleaning the lens in place. Obviously, since blocked laterals mean taxpayers cannot use their toilets, prompt reinstatement of the laterals is a political necessity with this work.

Consequently, operators like Defendants, and presumably Plaintiffs as well, want to do everything possible to keep the camera lens clean. Because of the width of the ports, any orientation in the 9:00 range will aim motor oil at the camera. The 6:00 orientation will stir up the effluent and may cause foaming if there is laundry discharge. The 12:00 orientation is likely to spin cutting debris toward the camera, as well as any effluent which might be leaking from the lateral. All parties seem to agree that the most efficient orientation of the cap is 3:00 which is also agreed to be non-infringing. As noted above, the manufacturer now ships the cutter with the cap in that orientation and with extra exhaust tubes to keep the lens clean.

The question, then, is whether the Defendants ever operated the cutter with the cap located somewhere between 11:00 and 1:00. To prove they had, Plaintiffs relied principally on the testimony of John Hale, their former trial attorney in this case.

Mr. Hale was at the Oakwood job site on the evening of August 7, 1990, about 7:00 p.m. and saw the accused device sitting on the ground. Viewing it from the rear, he claimed he did not see the exhaust ports; he did not examine the machine from any other perspective.

Mr. Hale returned to the job site the next morning. While cutting was in progress, he looked into the operating van and viewed the monitor. Sunlight obscured the view to some extent, and in any event problems developed and cutting stopped for repairs. He returned to the job site about 3:00 and got a better view of the monitor. He claimed that he could see incompletely detached shards of pipe material being blown towards the camera in such a way that the exhaust ports must have been oriented to 12:00. He claims he asked the operator why shards and water were moving as they were and the operator answered it was because the exhaust ports were turned up towards the tool.[3]

I do not find Mr. Hale's testimony very credible for a number of reasons.

First of all, as to his alleged observations of the monitor himself, Mr. Gilleland, supervising engineer for Cues, the manufacturer of this van, testified how difficult it would be even for a trained observer to make useful observations from the angle and at the distance Mr. Hale was from the screen. While Mr. Hale has significant experience thirty years ago in photogrammetry, there was no showing that he has maintained any expertise or that any retained expertise is applicable to interpreting television images of the insides of sewer pipes. Messrs. Gilleland, Simcox, and Donathan all testified that the rotating cutter (moving at about 6500 rpm) generates a fan effect which might also blow shards. Plaintiffs' demonstration in the courtroom of how easy it supposedly is to make these observations was not convincing, given the differences in lighting and probable quality of the video images used for the demonstration.[4] Mr. Hale recorded his observations in a contemporaneous letter to his client, but did not mention the liner shards. DX AK–2.

---

3. Mr. Hale had disqualified himself as Plaintiffs' trial attorney so as to be able to testify. On Defendants' motion, he was precluded, pursuant to Disciplinary Rule 7–104(A), from testifying as to any comments made to him by Defendants' employees which would qualify as admissions of a party opponent under F.R.Evid. 801(d)(2)(D). He was permitted to testify to the operator's comment not as an admission, but as a present sense impression. F.R.Evid. 803(1).

4. Plaintiffs used PX 8 for the demonstration, a marketing videotape prepared by Midwest. Also available, but not used, was PX 9, a videotape of the cutter in actual operation at a site in Springfield, Illinois.

Secondly, although the operator's comment is admissible under F.R.Evid. 803(3), it is not particularly persuasive. It was elicited by a skilled cross-examiner asking leading questions. It was not actually of a direct sense impression, but an interpretation of a televised image. Because it is not subject to cross-examination, the Court has no way of knowing whether it was a considered comment or off hand, whether the operator considered the question or made what he thought was a throwaway comment to a casual onlooker.

In sum, Mr. Hale's testimony is weak indeed even when considered alone. But it does not stand alone. Opposed to it is the testimony of Arthur Simcox, Midwest's mechanic at the time of the Oakwood Project, who testified that the cap was always used in the 3:00 position and was secured in that position by the use of Loctite applied to the threaded portion of the screw and to the collar of the cap where it contacts the inside of the motor housing. Despite removal of the threaded screw, no witness who tried at trial was able to rotate the cap on DX A from the 3:00 position, so apparently the Loctite worked. Mr. Simcox testified he had never seen it move after applying Loctite, even when there had been enough vibration to loosen the affixing screw.

Mr. Simcox's testimony was corroborated by Donnie Donathan, Midwest's present field operations foreman, who testified the cap was always used in the 3:00 position and secured there by Loctite of the same variety Mr. Simcox mentioned. (See PX 34). Speculations by Plaintiffs' witnesses about possible inadequate cure times or the effect of exposing Loctite to water or the amount of force actually needed to break a Loctite bond were just that, speculations.

I conclude that the accused device was not used on the Oakwood Project in an infringing configuration, to wit, with the exhaust cap positioned anywhere between 11:00 and 1:00.

## DOCTRINE OF EQUIVALENTS

The accused device also does not infringe under the doctrine of equivalents because it does not have features that perform substantially the same function, in substantially the same way, to achieve the same result as the device claimed in either claim 11 or 13 of the '908 patent.

The accused cutter does not equivalently have the limitation of the air motor exhaust "directed toward the conduit engaging position" of claims 11 and 13 of the '908 patent because the air motor exhaust is directed *away* from the conduit engaging position so that the camera lens remains clear.

The accused cutter also does not equivalently have a "duct" as that term is used in claim 11 because the exhaust cap of the accused cutter is not an extended conduit attached to the exhaust port of the pneumatic motor. The exhaust cap on the accused cutter does not perform the function of directing the exhaust at the cutting tool in order to blow debris away from the tool and does not achieve the same result as intended for the duct by the inventor. Apparently in actual practice blowing debris away from the cutting tool is not as important as keeping effluent and oil off the camera, or the result is achieved by the centrifugal force or air generated by rotation of the tool.

The accused cutter does not equivalently have the limitation of claim 13 which requires a "source of gas under pressure" as that term is used in the '908 patent.

Nor does the accused cutter equivalently have the limitation of a carriage, because the accused cutter supports itself on its housing, and does not have any structure that performs substantially the same function, in substantially same way, to achieve the same result as the "carriage" described in the '908 patent.

Even if the accused device had equivalent structures to the patent which performed the same functions in the same way, Plaintiffs would not be entitled to recover because they are estopped from relying on equivalence. As Mr. Kilworth testified without contradiction, reliance on the doctrine of equivalents is barred by prosecution or "file wrapper" estoppel if,

as happened here, a claim was initially rejected over the prior art and only allowed because of the incorporation of a particular element. The file wrapper here shows that Claim 11 (initially numbered 13) was rejected by the examiner and only allowed when original Claim 14 was incorporated into it as element I.

 Plaintiffs argue that the accused device is capable of being configured in an infringing manner and therefore infringes.[5] The Court is persuaded upon examination of the authorities cited by the parties that capability of infringement does not create liability in this case.

First of all, Defendants are only users of the accused device, not manufacturers, and the authorities cited by the parties limit this doctrine to manufacturers.

Secondly, there is absolutely no incentive for Defendants to use the accused device in the manner allegedly feared by Plaintiffs. All parties concede that is an inefficient manner of use, since it is likely to result in fogging the camera lens. The evidence shows Midwest stopped using the device with the unmodified cap before this litigation was filed and before they knew of any infringement claim because the new design, which Plaintiffs concede is non-infringing, is better.

Because Plaintiffs have not proved that Defendants are ever likely to use the accused device again in the manner which Plaintiffs allege to be infringing, they would not be entitled to injunctive relief even if the accused device were found to be infringing.

### CONCLUSION

Plaintiffs have failed to meet their burden of proving by a preponderance of the evidence that Defendants have infringed the '908 patent, either literally or equivalently. Accordingly, the Clerk will enter judgment in favor of Defendants and against the Plaintiffs, dismissing the Complaint herein with prejudice. On the Counterclaim, judgment will enter in favor of

Defendants and against the Plaintiffs, declaring that Defendants have not infringed the '908 patent.

IT IS SO ORDERED.

---

5. This argument assumes the Court finds the accused device has both a "carriage" and a "duct" which, of course, the Court has not found.