**BOSE CORPORATION, Plaintiff,**

v.

**JBL, INC., Defendant.**

**JBL, Inc., Counter–Claimant,**

v.

**Bose Corporation, Counterclaim Defendant.**

**No. Civ.A. 98–10209–PBS.**

United States District Court, D. Massachusetts.

April 14, 2000.

Charles Hieken, Gregory A. Madera, Shelley K. Wessels, Steven R. Katz, Fish & Richardson, Boston, MA, for Plaintiff.

Neil V. McKittrick, Hill & Barlow, Boston, MA, Victor G. Savikas, Maria K. Nelson, Marsha Durko, Jones, Day, Reavis & Pogue, Los Angeles, CA, for Defendant.

## MEMORANDUM AND ORDER

SARIS, District Judge.

### INTRODUCTION

This is a patent infringement suit between two companies that design and manufacture audio loudspeakers. Plaintiff Bose Corporation ("Bose") claims that defendant JBL, Inc. ("JBL") infringed U.S.Patent No. 5,714,721, entitled "PORTING" ("the '721 patent") which relates to a loudspeaker enclosure with a port for radiating acoustic energy from a region inside the enclosure to a region outside the enclosure at high sound levels without audible "port noise." The design of the port tube is critical to eliminating this audible "port noise." The specific feature at issue here is the shape of the boundary surrounding the port tube. The '721 patent contains a claim limitation which defines this boundary as "an ellipse having a major diameter." The JBL speakers that are the subject of JBL's motion for summary judgment of non-infringement[1] contain boundaries defined by curves that are not exact mathematical ellipses.

Bose claims that JBL has infringed the '721 patent by making and selling speaker enclosures covered by the patent claims. JBL counterclaims, seeking a declaration that Bose's patent is invalid and that JBL has not infringed. JBL argues that since the curves defining its port boundaries are not ellipses, there is no literal infringement. Furthermore, JBL argues that Bose is estopped to assert infringement by equivalents, as applied to JBL's accused models, because amendments and cancellations Bose made during prosecution of the patent application give rise to prosecution history estoppel. JBL moves for summary judgment of non-infringement. Bose opposes JBL's motion, and moves for summary judgment that claim 1 of the '721 patent covers JBL's loudspeaker enclosures. Bose's motion includes both the models subject to JBL's motion for summary judgment of non-infringement, as well as several other models which JBL has admitted have boundaries defined by an ellipse.[2]

For the reasons stated below, I **ALLOW** JBL's motion for summary judgment of non-infringement, to the extent it seeks a declaration that the JBL speaker models

---

1. The speaker models that are the subject of JBL's motion for summary judgment of non-infringement are: N24; N26; N28; N38; ND310; S26; S38; S312; SCS125; ESC300B and ESC350.

2. JBL has conceded that the following models have port tube boundaries defined by an ellipse: MUSIC 10, MUSIC 15, MUSIC 20, SCS 110, SCS 115, SCS 116, SCS 120, ESC 550, SPK 550, Bass 10, Bass 15, Bass 16, Bass 20, Festival 80, Bass 550, SVA 1500, SVACENTER, S50, ESC300, and SUB300. As to these models, JBL still argues its affirmative defense of invalidity.

that are not mathematical ellipses do not *literally* infringe the '721 patent. I *DENY* JBL's motion seeking a declaration that JBL's models do not infringe under the doctrine of equivalents. I *ALLOW* Bose's motion for summary judgment as to the speaker models which JBL has admitted contain port tube boundaries defined by ellipses. I *DENY* Bose's motion as to the models in dispute in JBL's motion for summary judgment of non-infringement.

### BACKGROUND FACTS

The following facts are undisputed, unless otherwise noted.

### A. Prosecution History of the '721 Patent

On December 3, 1990, Bose filed a patent application, Serial No. 621,531, seeking protection for a speaker enclosure with multiple subchambers and passive radiators. This application ultimately issued on March 3, 1992 as U.S.Patent No. 5,092,424 to Schreiber et al. (the "Schreiber patent"). On February 27, 1992, prior to issuance of the Schreiber patent, Bose filed a "continuation-in-part," ("C–I–P"), Serial No. 843,858, of the Schreiber application related to porting in a loudspeaker system. In this C–I–P application, claim 1 was not limited to an elliptical port. Claim 1 read as follows:

> A loudspeaker enclosure having an inside volume, and at least one port characterized by predetermined acoustic mass intercoupling said inside volume and the region outside said enclosure having a smoothly flared input end within said inside volume and a smoothly flared output end adjacent to the region outside said inside volume.

Claim 2 of the C–I–P application was dependent upon claim 1 and added the limitation, "wherein said port defines a boundary between the acoustic mass

therein and said inside volume, said boundary being defined by an ellipse." Claim 3 was made dependent upon claim 2, and added the limitation, "wherein the length of said port corresponds to the major diameter of said ellipse."

The Patent and Trademark Office ("PTO") Examiner rejected the originally filed claim 1 under 35 U.S.C. § 102(b) as anticipated by U.S.Patent No. 3,142,353, issued to Todisco ("Todisco") or U.S.Patent No. 4,213,515, issued to Laupman ("Laupman"). The Examiner stated that claims 2 through 4, relating to an elliptical port, would be allowable if rewritten in independent form to include all of the limitations of the base claim and any intervening claims.

Bose then amended claim 1, and added the limitation "wherein said at least one port has a lengthwise axis, said at least one port being symmetrical about said lengthwise axis, the entire perimeter of both said input and said output end being smoothly flared." (Amendment A). The Examiner again rejected the amended claim as anticipated by Todisco or Laupman.[3] Bose unsuccessfully appealed the Examiner's rejection, then amended claim 1 again to "clarify that both the input and output end are smoothly flared." (Amendment C). The Examiner then rejected claim 1 under 35 U.S.C. § 102(e) as anticipated by a newly found prior art patent, U.S.Patent No. 5,109,422, issued to Furukawa ("Furukawa"). The Examiner found that Furukawa disclosed the following:

> [a] loudspeaker enclosure having an inside volume, and at least one port characterized by predetermined acoustic mass intercoupling said inside volume and the region outside said enclosure having a smoothly flared input end within said volume and a smoothly flared output end adjacent to the region outside said inside volume, wherein said at

---

**3.** The rejection based on Laupman was eventually reversed by the Board of Patent Appeals and Interferences on the grounds that the two ends of Laupman could not be "flared" be-

cause they "terminate at a completely straight side of the member." (*See* Katz Decl., Exh. B)

least one port has a lengthwise axis . . . said at least one port being symmetrical about said lengthwise axis, [and] the entire perimeter of both said input end and said output end being smoothly flared.

In addition, Furukawa disclosed each of the ports having a "circular cross section" and one port which is "symmetrical about a plane perpendicular to said lengthwise axis midway between said input end and said output end."

Bose then amended claim 1 to add the following limitation:

with the cross-sectional area of said at least one port progressively decreasing from both said input end and said output end toward the center of said at least one port for substantially the distance between said input end and said center and substantially the distance between said output end and said center.

(Amendment D). Bose argued to the Examiner:

While the embodiments disclosed in this application have this progressively decreasing cross-sectional area substantially all the way from each end to the center, one ought not to be able to escape infringement by flattening a short length of the center portion.

The Examiner rejected claim 1 on three separate grounds. First, the Examiner rejected claim 1 under 35 U.S.C. § 132 because it introduced "new matter" into the specification. The Examiner stated:

The added material which is not supported by the original disclosure is as follows: "Both flared port tube P3 and flared port conduit 21 have a cross-sectional area progressively decreasing from each end toward the center for *substantially* the distance between each end and the center." This is deemed to be new matter because the originally filed specification fails to describe the "port tube P3" in the manner set forth in this amendment. Moreover, this amendment directly contradicts the "port tube P3" illustrated in Figure 1.

Therein, the "port tube P3" is shown with "a toroid of elliptical cross section" without any deviation therefrom.

The Examiner also rejected amended claim 1 under 35 U.S.C. § 112 because the term "substantially" rendered the claim indefinite; that is, it did not "enable one skilled in the art to reasonably establish what may be construed as being within the metes and bounds of the term of degree." Finally, the Examiner rejected amended claim 1 under 35 U.S.C. § 102(e), stating that the "newly added limitation to claim 1 fails to distinguish the claimed invention from the disclosure of Furukawa since the cross-sectional area of the port of Furukawa 'progressively decreas[es] from each end toward the center for *substantially* the distance between each end and the center.' "

Bose made two additional sets of amendments to claim 1. In the first set, Bose substituted the phrase "a minimum inside" for "the center of"; the term "minimum" for "center"; and the phrase "the entire distance" for "the distance." (Amendment E). Finally, Bose substituted "a plane of minimum cross-section area inside" and "plane of minimum cross-sectional area" for "a minimum inside" and "minimum." (Amendment F). The Examiner rejected both of these amended claims on the same grounds as he rejected Amendment D: new matter; indefiniteness; and prior art. A summary of each iteration of claim 1 is attached hereto as Exhibit A.

Bose ultimately cancelled the originally filed claim 1 as amended. Bose then rewrote claim 2 as independent claim 1, and rewrote the remaining claims to depend upon claim 1. The Examiner required Bose to add the phrase "having a major diameter" to claim 1 to provide antecedent basis for the reference to the term in claim 3, as issued. On September 9, 1997, the Examiner allowed the pending claims. Claim 1, the only independent claim of the '721 patent, issued as follows:

1. A loudspeaker enclosure with at least one port for radiating acoustic en-

ergy to a region outside said enclosure and having an inside volume,

said at least one port having an axis and characterized by predetermined acoustic mass intercoupling said inside volume and the region outside said enclosure having a smoothly flared input end within said input volume and a smoothly flared output end adjacent to the region outside said volume,

wherein said port defines a boundary between the acoustic mass therein and said inside volume,

said boundary being defined by an ellipse having a major diameter.

## B. The JBL Port Tube Boundaries

The JBL port tubes that are the subject of its motion for summary judgment for non-infringement have one of two curves, the LinearA curve and the Exponential curve, that define the boundary that divides the acoustic mass from the inside volume. The formulas for these curves vary from the mathematical formula for an ellipse. Accordingly, neither of JBL's curves has a major diameter, which is the longest straight line segment joining two points on the curve of an ellipse. As used in the port tubes, however, JBL's curves are substantially elliptical. Finally, regardless of which party's graphs, sketches or laser scans one consults, JBL's port tubes are continuously curved, and thus (unlike the Furukawa tubes) have a continuously decreasing cross-section.

### DISCUSSION

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). Summary judgment is improper "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liber-*

*ty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## A. Literal Infringement

"Determining whether a patent has been infringed involves two steps: (1) claim construction to determine the scope of the claims, followed by (2) determination whether the properly construed claim encompasses the accused structure." *Bai v. L & L Wings, Inc.*, 160 F.3d 1350, 1353 (Fed.Cir.1998). An accused device may infringe in one of two ways: literally, or under the doctrine of equivalents. "Literal infringement requires that the accused device contain each limitation of the claim exactly; any deviation from the claim precludes a finding of literal infringement." *Litton Sys., Inc. v. Honeywell, Inc.*, 140 F.3d 1449, 1454 (Fed.Cir.1998). Summary judgment is proper as to issues of literal infringement, then, where "no reasonable jury could find that every limitation recited in the properly construed claim either is or is not found in the accused device." *Bai*, 160 F.3d at 1353.

The question of literal infringement in this case turns on the interpretation of the phrase, "said boundary being defined by an ellipse having a major diameter" contained in claim 1 of the '721 patent. Bose claims that the correct interpretation of the phrase encompasses port boundaries that are an "elongated circle" or "oval." JBL contends that "ellipse having a major diameter" has a single plain meaning: an ellipse is a well-known geometric shape with a precise mathematical definition. I agree with JBL.

To construe a claim, courts principally consult evidence intrinsic to the patent, including the claims themselves, the specifications, and the prosecution history. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582–83 (Fed.Cir.1996). Looking first to the claim language, "words in a claim are generally given their ordinary and customary meaning," and if a patentee wishes to use a special definition of a term, that special definition must be

clearly stated in the patent specification or prosecution history. *Id.* at 1582. Bose did not do so here.

■ Looking to the claim term itself, I find that the term "ellipse having a major diameter" unambiguously connotes the geometric definition of "ellipse", a shape defined by the formula:

$$\frac{x^2}{a^2} + \frac{y^2}{b^2} = 1$$

where "a" and "b" are constants. The inclusion of the phrase "having a major diameter" invokes the very "mathematically precise" meaning that Bose now wishes to disavow. A "major diameter," as stated above, is the longest chord, or straight line segment, joining two points on a curve. The major diameter passes through the center of an ellipse.

The prosecution history supports this narrow interpretation of the phrase "ellipse having a major diameter." Bose amended claim 1 several times, and, at least in response to its last three amendments (Amendments D through F), the Examiner rejected proposed claims which would have been elliptical, broadly speaking, but which left room for a short, flattened section. In Amendment D, for example, Bose sought coverage for a port tube with "cross-sectional area progressively decreasing from each end toward the center for *substantially* the distance between each end and the center."

■ Bose offers alternative dictionary definitions of the term "ellipse" as meaning an "oval" or "elongated circle," as well as the affidavit of its electroacoustical engineer, Michael O'Connell, who asserts that "ellipse" is understood by O'Connell and those skilled in the art of speaker design to mean "an elongated circle or symmetrical oval, a portion of which corresponds to a section along the length of the continuously curved inside surface of the port that is of tapered cross section...." As a threshold matter, courts may not look to extrinsic evidence to construe a claim term unless the intrinsic evidence is am-

biguous or insufficient. *See Bell & Howell Document Management Prods. Co. v. Altek Sys.*, 132 F.3d 701, 706 (Fed.Cir.1997). Here, I find that the intrinsic evidence is sufficient to properly construe claim 1.

But even assuming that some ambiguity arose in the intrinsic evidence, Bose's proposed constructions fail on their own terms as well. As to the "oval" definition, the dictionary discloses definitions for "oval" which range from "a racetrack in the shape of an oval or a rectangle having rounded corners" to "having the shape of an egg ... broadly elliptical." *Merriam Webster's Collegiate Dictionary* 827 (10th ed.1993). The former definition of "oval" stands in contrast to Bose's repeated insistence that its port tube boundary is continuously curved. In fact, this is the basis upon which Bose distinguished the Furukawa prior art.

Both of the dictionary "oval" definitions are so broad that they would eviscerate the "having a major diameter" qualification in claim 1. The "major diameter" language undercuts Bose's argument that "ellipse" should not be confined, at least for literal infringement purposes, by its geometric definition. *See Vitronics*, 90 F.3d at 1584 n. 6 (approving the use of dictionaries in construing claim terms, so long as dictionary definitions do not contradict meanings ascertained by reading the patent documents); *Bai v. L & L Wings, Inc.*, No. 95–10824, 1997 WL 527870, at *2 (S.D.N.Y. 1997) (finding that geometric definition found in dictionary was in accord with patent specifications, and concluding that "hemisphere" meant "less than a sphere, but nevertheless part of a sphere"), *aff'd*, 160 F.3d 1350 (Fed.Cir.1998).

Finally, the "elongated circle" definition Bose proposes actually bolsters JBL's argument. JBL's expert Professor Robert Greene provides the following definition:

An ellipsis is, by definition, a closed plane curve generated by a point moving such that the sum of its distances to two fixed points (called "foci") is a constant (larger than the distance between the

two fixed points). This definition is also *exactly* equivalent, however, to another characterization that is easier to understand intuitively and easier to check in practice. Namely, an ellipse is the curve obtained by enlarging a circle in one direction while leaving it unchanged in the perpendicular direction.

(emphasis added). Thus, an "elongated circle" is equivalent to an ellipse.

■ Having thus construed claim 1, I conclude that no reasonable jury could find that the JBL accused port tubes with LinearA and Exponential curves literally infringe the '721 patent. The literal infringement analysis here is straightforward: the port tube boundaries in JBL's accused products are not defined by ellipses with major diameters, but rather by the LinearA and Exponential curves. Since claim 1 of the '721 patent specifies that the port tube boundary of Bose's invention is "an ellipse having a major diameter," JBL's eleven disputed models do not literally infringe.[4]

## B. Doctrine of Equivalents

■ An accused device that does not infringe literally may still infringe under the doctrine of equivalents, if the patent holder shows that the accused device performs substantially the same function, in substantially the same way, to produce substantially the same result as the claimed invention. *See Graver Tank & Mfg. Co. v. Linde Air Prods. Co.,* 339 U.S. 605, 608, 70 S.Ct. 854, 94 L.Ed. 1097 (1950). Moreover, "the doctrine of equivalents must be applied to individual elements of the claim, not to the invention as a whole." *Litton,* 140 F.3d at 1454 (quoting *Warner–Jenkinson v. Hilton Davis Chem. Co.,* 520 U.S. 17, 29, 117 S.Ct. 1040, 1049, 137 L.Ed.2d 146 (1997)). "An analysis of the role played by each element in the context of the specific patent claim will

thus inform the inquiry as to whether a substitute element matches the function, way and result of the claimed element, or whether the substitute element plays a role substantially different from the claimed element." *Warner–Jenkinson,* 520 U.S. at 29, 117 S.Ct. 1040.

■ Summary judgment is properly rendered on a claim of infringement under the doctrine of equivalents where "the evidence is such that no reasonable jury could determine two elements to be equivalent." *Bai,* 160 F.3d at 1353–54 (quoting *Warner–Jenkinson,* 520 U.S. at 39 n. 8, 117 S.Ct. 1040). Moreover, "if prosecution history estoppel would apply or if a theory of equivalence would entirely vitiate a particular claim element, partial or complete summary judgment should be rendered by the court, as there would be no further material issue for the jury to resolve." *Id.* at 1354 (quoting *Warner–Jenkinson,* 520 U.S. at 39 n. 8, 117 S.Ct. 1040). Whether prosecution history estoppel applies is a question of law. *See La Bounty Mfg., Inc. v. United States Int'l Trade Comm'n,* 867 F.2d 1572, 1576 (Fed.Cir.1989).

### 1. Prosecution History Estoppel

JBL contends that any claim of infringement under the doctrine of equivalents is barred by the application of prosecution history estoppel. Specifically, JBL argues that Bose's multiple amendments of the original claim 1, and its eventual abandonment of that broader claim, bar Bose from recapturing through litigation patent protection for port tube boundaries other than those defined by "an ellipse having a major diameter." Alternatively, JBL argues that the prior art restricts the scope of the doctrine of equivalents, and urges the Court to engage in a "hypothetical claim analysis."

Bose responds that, looking to the reasons it amended claim 1, Bose did not

---

4. Of course, the JBL models that admittedly have port tube boundaries defined by an ellipse do literally infringe the '721 patent, since those port tubes also contain every oth-

er limitation of claim 1 of the '721 patent. As to these models, JBL relies upon successfully proving its affirmative defense of invalidity to avoid liability.

surrender subject matter that would include JBL's LinearA and Exponential curved port tubes, but rather amended the claim to distinguish its port boundary from a more flattened cylindrical boundary in the prior art Furukawa patent. Accordingly, Bose argues that prosecution history estoppel does not arise. Bose also contends that since the originally filed claim 1 had nothing to do with an ellipse, the eventual cancellation of that broader claim is irrelevant to this case. Although the application of prosecution history estoppel requires interpretation of a truly elliptical area of the law, I conclude that Bose's position is the better supported one.

The doctrine of prosecution history estoppel "bars a patentee from construing its claims in a way that would resurrect subject matter previously surrendered during prosecution of the patent," and thus, under certain circumstances, "prevents a patentee from enforcing its claims against otherwise legally equivalent structures." *Mannesmann Demag Corp. v. Engineered Metal Prods. Co.*, 793 F.2d 1279, 1284–85 (Fed.Cir.1986) (invoking estoppel where plaintiff's "enlarged claim interpretation … falls squarely within the claim scope [plaintiff] relinquished in order to overcome the cited references"). The "surrender" of subject matter can come about via amendments to a claim to avoid prior art. It can also arise where, as here, a broad independent claim is cancelled, and dependent, narrower claims are rewritten in independent form and ultimately allowed. *See Haynes Int'l, Inc. v. Jessop Steel Co.*, 8 F.3d 1573, 1578–79 (Fed.Cir.1993), *clarified*, 15 F.3d 1076 (Fed.Cir.1994) (upholding application of prosecution history estoppel where the cancelled claim upon which the issued claim originally depended contained a range of chromium contents broad enough to encompass the defendant's product, and where the "chromium content was the principal distinction between the claimed subject matter and the prior art"); *Diversitech Corp. v. Century Steps, Inc.*, 850 F.2d 675, 681 (Fed.Cir. 1988) (finding estoppel where issued claim

was initially dependent on a broader claim that was rejected by the PTO and eventually cancelled).

█ Arguments made during prosecution, without amendments to claim language, may give rise to estoppel if those arguments are "sufficient to evince a clear and unmistakable surrender of subject matter." *Litton*, 140 F.3d at 1458; *see also Texas Instruments, Inc. v. United States Int'l Trade Comm'n*, 988 F.2d 1165, 1174 (Fed.Cir.1993) (emphasizing that the proper test for estoppel examines the "prosecution history taken as a whole"); *Kinzenbaw v. Deere & Co.*, 741 F.2d 383, 389 (Fed.Cir.1984).

█ The key components of a prosecution history estoppel analysis are determining what subject matter was surrendered, *and* the reason that it was surrendered. "The legal standard for determining what subject matter was relinquished is an objective one, measured from the vantage point of what a competitor was reasonably entitled to conclude, from the prosecution history, that the applicant gave up to procure issuance of the patent." *Haynes*, 8 F.3d at 1578. Once the subject matter surrendered is identified, courts look to the reasons behind that surrender. In *Warner–Jenkinson*, the Supreme Court declined to adopt a bright line rule that "any surrender of subject matter during patent prosecution, regardless of the reason for such surrender, precludes recapturing any part of that subject matter, even if it is equivalent to the matter expressly claimed." 520 U.S. at 30, 117 S.Ct. 1040; *see also Hughes Aircraft Co. v. United States*, 140 F.3d 1470, 1476 (Fed.Cir. 1998) (looking to the "reason behind an amendment" to determine what subject matter the patentee was estopped from reclaiming in litigation).

Even amendments made to overcome prior art do not necessarily preclude a range of equivalents. *See Litton*, 140 F.3d at 1456 (stating that "an amendment to

claim language in response to prior art 'may have a limiting effect within a spectrum ranging from great to small to zero'") (quoting *Hughes Aircraft Co. v. United States,* 717 F.2d 1351, 1363 (Fed. Cir.1983)). Accordingly, "when a rejection based on prior art did not dictate the claim change that was made, it is necessary to look at the specific change and the reason, in ascertaining whether an estoppel has arisen." *Pall Corp. v. Micron Separations, Inc.,* 66 F.3d 1211, 1219 (Fed.Cir. 1995).

Amendments made to overcome other types of patentability obstacles may or may not give rise to an estoppel, depending on the facts of the case.[5] *See id.* at 1220 (finding, on facts of case, that amendment made to overcome § 112 rejection did not give rise to estoppel); *Sextant Avionique, S.A. v. Analog Devices, Inc.,* 172 F.3d 817, 825 (Fed.Cir.1999) (declining to decide whether an amendment made in response to a § 112 rejection referring to the requirements of the specification is made for "reasons of patentability" and gives rise to estoppel); *Sun Studs, Inc. v. ATA Equip. Leasing, Inc.,* 872 F.2d 978, 990 (Fed.Cir.1989) (finding that rejection based on a lack of enablement, which was withdrawn based on the patentee's arguments to the PTO, did not give rise to estoppel); *Moeller v. Ionetics, Inc.,* 794 F.2d 653, 659–60 (Fed.Cir.1986) (finding, on facts of case, that amendment made to describe the invention more particularly did not give rise to estoppel), *overruled on other grounds by Markman v. Westview Instruments, Inc.,* 52 F.3d 967 (Fed.Cir. 1995).

It is undisputed that over the course of its several amendments to the original claim 1, Bose progressively narrowed its claim language in response to prior art,

indefiniteness, and new matter rejections. Bose also made various arguments to support its appeals of these rejections. The Examiner rejected those arguments, and Bose eventually cancelled claim 1. Moreover, the parties do not dispute that JBL's accused devices would fall under the language of claim 1 as originally filed and as amended. Thus, application of prosecution history estoppel here will turn on a close examination of the exchanges between Bose and the PTO to discern the reasons for Bose's surrender of this material.

█ Bose argues that its amendments to claim 1 were aimed only at distinguishing its port from the Furukawa port, which has a flattened, cylindrical portion of its boundary. Moreover, Bose contends that since neither Bose nor the Examiner ever commented on the meaning of the term "ellipse," as used in originally dependent claim 2, the rewritten claim 2 (which became claim 1 of the '721 patent) covers ports having boundaries defined by an ellipse or its equivalent. Bose argues that the prosecution history of the claim eventually cancelled is irrelevant to this case.

First, under *Haynes,* where an allowed claim was originally dependent upon a broader independent claim which was cancelled, prosecution history estoppel may apply. 8 F.3d at 1579. Despite Bose's position to the contrary, then, the prosecution history of the original claim 1 is highly relevant. However, the language of Bose's amendments to claim 1, as well as Bose's arguments to the PTO Examiner, show that those amendments were primarily meant to design around the flattened, cylindrical sections of Furukawa. Since JBL's port tubes lack this flattened, cylindrical portion, they are not within the

---

5. On remand from the United States Supreme Court, the Federal Circuit is addressing what types of amendments to a claim give rise to prosecution history estoppel because they stem from a "substantial reason related to patentability." *See Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.,* 187 F.3d 1381,

1381–82 (Fed.Cir.1999) (quoting *Warner–Jenkinson,* 520 U.S. at 33, 117 S.Ct. 1040) (ordering briefing of several issues presenting interpretive questions under *Warner–Jenkinson* ). This turgid area of law is best described as the doctrine of ambivalence.

scope of subject matter Bose was forced to surrender to obtain the '721 patent.

Bose made five sets of amendments to the original claim 1, four of which (Amendments C through F) met with rejections based on the prior art Furukawa patent. After each rejection, Bose progressively narrowed its claim to encompass, for example, port boundaries whose cross sections decrease from both the input and output ends for "substantially the distance" between the two ends (Amendment D) or "substantially the entire distance" between the two ends (Amendment E). The Examiner rejected each such iteration, finding the proposed claim language too close to Furukawa. A port tube with flared input and output ends, whose cross sections decrease for "substantially the distance" between the ends, would still leave room for a small flattened portion along the curve.

Bose's arguments to the Examiner similarly show that Bose was trying to develop claim language to avoid the flattened, cylindrical quality of Furukawa's port tubes. For example, in its remarks supporting Amendment D, (*see* Exh. M to Decl. of Marsha Durko at 10), Bose defended its proposed language covering port tubes with "the cross-sectional area progressively decreasing from each end for substantially the distance between each input end and the center." Bose emphasized, however, that "one ought not to be able to escape infringement by flattening a short length of the center portion." This argument was directed at distinguishing Furukawa's longer, cylindrical tube while still trying to obtain patent coverage of a port tube that had a shorter, flattened center portion. Similarly, in its remarks accompanying Amendment E, (*see* Exh. O to Decl. of Marsha Durko at 14), Bose attempted to convince the Examiner that the Furukawa art lacks a "cross-sectional area progressively decreasing for substantially the entire distance" between both ends, since, in Bose's view, the flattened portions of Furukawa (i.e., those of uniform cross sec-

tional area) are significantly longer than the curved portions (i.e., those of progressively decreasing cross-sectional area). In its remarks accompanying Exhibit F, Bose's focus on avoiding the flattened, cylindrical component of Furukawa is equally clear:

> We have amended claim 1 to call for the progressive decrease from both input end and output end being toward a plane of minimum cross-sectional area . . . to make it perfectly clear that the claimed structure excludes the port disclosed in the reference where the internal portion of the port between the flared input and flared output is a cylinder of uniform cross-section that extends for a significant portion of the port length.

(Exh. P to Decl. of Marsha Durko at 12.) In sum, Bose's arguments to the Examiner do not show a "clear and unmistakable surrender" of subject matter encompassing JBL's port tubes.

The accused JBL port tubes do not have a flattened, cylindrical portion; they are, like Bose's port tubes, continuously curved, with a progressively decreasing cross-sectional area. *See Hughes Aircraft,* 140 F.3d at 1477 (finding that prosecution history estoppel applied, but did not preclude all equivalents, where the accused device did not fall into the range of subject matter the patentee surrendered). Therefore, while the prosecution history would preclude Bose from claiming any range of equivalents that contain the flattened section, neither the prior art nor Bose's arguments during prosecution dictate that Bose be limited to the literal scope of claim 2, and Bose is still entitled to some range of equivalents of an ellipse.

The Examiner's other objections to Bose's original claim 1 do not give rise to estoppel as to JBL's accused port tubes. The Federal Circuit has not squarely addressed whether amendments made in response to "new matter" objections, pursuant to 35 U.S.C. § 132, give rise to prosecution history estoppel. But on the

record of this case, I conclude that the new matter objections, and, specifically, the Examiner's mandate that Bose be confined to a "toroid of elliptical cross section, without any deviation therefrom" were made in a similar context as the prior art objections. The Examiner was comparing Bose's proposed language, which would have allowed for a flattened portion of a port boundary, with its original application, which disclosed a continuously curved ellipse.

Turning to the "indefiniteness" objections, the Federal Circuit has declined to adopt a bright-line rule as to whether amendments made to overcome § 112 objections are made for "reasons of patentability" and thus give rise to estoppel. *See Sextant Avionique,* 172 F.3d at 828–29; *Caterpillar Tractor Co. v. Berco,* 714 F.2d 1110, 1115 (Fed.Cir.1983). On the facts of this case, they do not. The Examiner's indefiniteness objections related to Bose's use of the term "substantially" in Amendments D, E, and F. The prosecution history reveals that these, too, were objections made with the Furukawa port in mind. The Examiner states that the reason "substantially" is problematic is that, if one cannot discern what is "within the metes and bounds of the term," the proposed claim language would once again overlap with the Furukawa prior art. The indefiniteness objections, then, neither add nor subtract from the scope of the prosecution history estoppel raised by the prior art objections. JBL's port tubes do not fall within that scope.

I conclude that prosecution history estoppel does not apply to preclude Bose from asserting a range of equivalents as to JBL's substantially elliptical port tubes lacking a flattened, cylindrical portion in their center. Whether an accused device infringes under the doctrine of equivalents is a question of fact. *See Bai,* 160 F.3d at 1353. Since a reasonable jury could find that JBL's port tubes meet the 3–part *Graver Tank* test for infringement under the doctrine of equivalents, I deny JBL's

motion for summary judgment as to the doctrine of equivalents.

■ However, since there are disputed issues of fact on this point, I also deny Bose's motion for summary judgment that the JBL LinearA and Exponential port tubes infringe the '721 patent. Bose submitted the affidavit of Michael O'Connell, who states:

From an acoustic standpoint, ports having boundaries corresponding to the plotted Exponential and LinearA curves are indistinguishable from ports having the boundary of the patent defined by an ellipse and are also indistinguishable from a port having a boundary defined by a mathematically perfect ellipse.

(Decl. of Michael O'Connell dated Nov. 10, 1999 at ¶ 11.) Mr. O'Connell includes graphs comparing the cross sections of the accused JBL tubes with that of an ellipse. One of these graphs is attached as Exhibit B. O'Connell also points out that JBL's own port designer described the JBL ports as elliptical.

In response, JBL has offered the affidavit of Dr. Douglas Button, who concludes based on his tests that the JBL port tubes with the LinearA and Exponential curves reduce port noise in a different way and with a different result than Bose's elliptical port tubes. Button asserts that the rate at which the diameters of the port tubes decrease has some impact on their performance in eliminating port noise. Although the graph is worth one thousand words, the Button affidavit creates a disputed issue of fact appropriately resolved at trial.

### 2. Hypothetical Claim Analysis

As an alternative theory supporting its position on non-infringement, JBL urges the Court to engage in "hypothetical claim analysis," and argues that doing so will show that no hypothetical claim which encompasses JBL's port tubes would have been allowable over the prior art.

■ The doctrine of equivalents cannot be used to protect subject matter in, or

obvious in light of, the prior art. *See Athletic Alternatives, Inc. v. Prince Mfg., Inc.*, 73 F.3d 1573, 1582 (Fed.Cir.1996). Thus, the Federal Circuit limits the doctrine of equivalents to prevent its application if it would ensnare prior art. *See Marquip, Inc. v. Fosber Am., Inc.*, 198 F.3d 1363, 1367 (Fed.Cir.1999). "Because prior art limits the exclusive right available to an inventor, it also limits the range of permissible equivalents of a claim." *Id.* (citing *Wilson Sporting Goods v. David Geoffrey & Assoc.*, 904 F.2d 677, 684 (Fed. Cir.1990)).

The Federal Circuit has developed a methodology called "hypothetical claim analysis" to assist courts in determining whether the prior art prevents application of the doctrine of equivalents to a particular claim. *See Marquip*, 198 F.3d at 1367; *Wilson*, 904 F.2d at 684. Under hypothetical claim analysis, the inquiry is twofold. First, the court visualizes a hypothetical patent claim broad enough in scope to literally cover the accused device. Then, the court examines whether the PTO would have allowed that hypothetical claim over the prior art at the time of invention. *See Marquip*, 198 F.3d at 1367; *Wilson*, 904 F.2d at 684. If the hypothetical claim would have been allowed, then prior art is not a bar to infringement by equivalents; if the claim would not have been allowed, the prior art bars a finding of infringement by equivalents. *See Marquip*, 198 F.3d at 1367. As the court explained in *Wilson:*

> [Hypothetical claim analysis] allows use of traditional patentability rules and permits a more precise analysis than determining whether an accused product (which has no claim limitations on which to focus) would have been obvious in view of the prior art ... it [also] reminds us that [the patentee] is seeking coverage beyond the limits considered by the PTO examiner.

904 F.2d at 684. Using this approach, the Federal Circuit has precluded infringement under the doctrine of equivalents due to the prior art. *See, e.g., Streamfeeder,*

*LLC v. Sure–Feed Systems, Inc.*, 175 F.3d 974, 981–82 (Fed.Cir.1999); *Marquip*, 198 F.3d at 1368; *Key Mfg. Group, Inc. v. Microdot, Inc.*, 925 F.2d 1444, 1449 (Fed. Cir.1991).

JBL argues that any hypothetical claim that would cover JBL's LinearA and Exponential port tubes would not have been patentable over three pieces of prior art that were *not* before the PTO Examiner: the Glastonbury II port; the Akimichi port, and the KEF 104/2 port. JBL urges the Court to use the hypothetical claim language, "said boundary being defined by a smooth, continuous curve" or "said boundary being defined by a substantially elliptical curve." JBL concedes that such hypothetical constructions of claim 1, would encompass JBL's accused tubes, but insists that they would necessarily ensnare the Glastonbury II, Akimichi, and KEF 104/2 prior art. Thus, according to JBL, Bose flunks the hypothetical claim analysis test, and is barred from asserting equivalents.

The problem with JBL's argument is the raw state of the record. Bose vigorously disputes JBL's prior art references (Glastonbury II; Akimichi; and KEF 104/2). First, as to the Glastonbury II port, Bose disputes whether that port qualifies as prior art. It is unclear whether the Glastonbury II tube contains a boundary defined by an ellipse, or even whether, under JBL's "hypothetical claim," the Glastonbury II contains a boundary defined by a "smooth, continuous curve" or a "boundary defined by a substantially elliptical curve". The Glastonbury II contains an adjustable PVC pipe connecting the flared ends of the port. Bose argues, and some documentary evidence suggests, that this adjustable pipe was used to adjust the length of the tube when it was custom-installed into audio speakers. (Exh. C to Decl. of Marsha Durko.) If so, then Glastonbury II, like Furukawa, contained a flattened central portion and would not bar a range of equivalents to claim 1.

As for the Akimichi port, the affidavit of Bose's expert has raised disputed issues as to whether Akimichi reveals a port enclosing an acoustic mass for radiating acoustic energy. This dispute goes to the very function and goal of the two different devices. Moreover, even JBL acknowledges that the Akimichi port is built into the wall of the speaker enclosure; thus, it does not "define a boundary between the acoustic mass therein and said inside volume" as the claim 1 invention does. Whether or not JBL's hypothetical claim language pertaining to the shape of the boundary would encompass Akimichi's boundary shape, then, Akimichi does not meet the other specifications of claim 1.

As to the KEF 104/2, its boundary is continuously curved for a portion, but has a portion that forms a straight line at an angle with the port axis. As described by Bose's expert:

> [a] portion of the boundary forms a straight line at an angle with the port axis ... [t]his port is not symmetrical about a plane transverse to its axis midway between its ends. The KEF 104/2 reference does not disclose a port boundary that closely resembles an ellipse. The KEF 104/2 reference does not disclose a loudspeaker enclosure of any claim in the '721 patent.

(Decl. of Michael O'Connell dated Jan. 24, 1999 at 2, ¶ 11.)

In sum, the status of the three pieces of prior art to which JBL compares its port tubes is disputed. Further obfuscating the task is the fact that none of these "prior art" references was before the Examiner. Since, on the record now before the Court, it's difficult to know whether I'm comparing apples with apples or apples with oranges, or whether any of JBL's references should inform a hypothetical claim analysis, such an analysis is misplaced.

### ORDER

For the forgoing reasons, I **ALLOW** in part JBL's motion for summary judgment of non-infringement, to the extent it seeks a declaration that the JBL speaker models with LinearA and Exponential curved port tubes do not *literally* infringe the '721 patent. I **DENY** JBL's motion as to whether JBL models with the LinearA and Exponential curved port tubes infringe under the doctrine of equivalents. I **ALLOW** in part Bose's motion for summary judgment as to the speaker models which JBL has admitted contain port tube boundaries defined by ellipses (see note 2, above). I **DENY** Bose's motion as to the JBL models containing LinearA and Exponential curves.

### EXHIBIT "A"

### *Iterations of Claim 1*

**ORIGINAL CLAIM 1:** A loudspeaker enclosure having an inside volume, and at least one port characterized by predetermined acoustic mass intercoupling said inside volume and the region outside said enclosure having a smoothly flared input end within said inside volume and a smoothly flared output end adjacent to the region outside said inside volume. (Filed February 27, 1992.)

**AMENDMENT A:** A loudspeaker enclosure having an inside volume, and at least one port characterized by predetermined acoustic mass intercoupling said inside volume and the region outside said enclosure having a smoothly flared input end within said inside volume and a smoothly flared output end adjacent to the region outside said inside volume, *wherein said at least one port has a lengthwise axis, said at least one port being symmetrical about said lengthwise axis, the entire perimeter of both said input and said output end being smoothly flared.* (Amendment A of October 22, 1992.)

**AMENDMENT C:** A loudspeaker enclosure having an inside volume, and at least one port characterized by predetermined acoustic mass intercoupling said inside volume and the region outside said enclosure

having a smoothly flared input end within said inside volume and a smoothly flared output end adjacent to the region outside said inside volume, wherein said at least one port has a lengthwise axis, said at least one port being symmetrical about said lengthwise axis, the entire perimeter of both said input *end* and said output end being smoothly flared. (Amendment C After Decision on Appeal of May 27, 1995.)

**AMENDMENT D:** A loudspeaker enclosure having an inside volume, and at least one port characterized by predetermined acoustic mass intercoupling said inside volume and the region outside said enclosure having a smoothly flared input end within said inside volume and a smoothly flared output end adjacent to the region outside said inside volume, wherein said at least one port has a lengthwise axis, said at least one port being symmetrical about said lengthwise axis, the entire perimeter of both said input end and said output end being smoothly flared *with the cross-sectional area of said at least one port progressively decreasing from both said input end and said output end toward the center of said at least one port for substantially the distance between said input end and said center and substantially the distance between said output end and said center.* (Amendment D of September 7, 1995.)

**AMENDMENT E:** A loudspeaker enclosure having an inside volume, and at least one port characterized by predetermined acoustic mass intercoupling said inside volume and the region outside said enclosure having a smoothly flared input end within said inside volume and a smoothly flared output end adjacent to the region outside said inside volume, wherein said at least one port has a lengthwise axis, said at least one port being symmetrical about said lengthwise axis, the entire perimeter of both said input end and said output end being smoothly flared with the cross-sectional area of said at least one port progressively decreasing from both said input end and said output end toward *a minimum inside* said at least one port for substantially the *entire* distance between said input end and said *minimum* and substantially the *entire* distance between said output end and said *minimum.* (Amendment E of March 14, 1996.)

**AMENDMENT F:** A loudspeaker enclosure having an inside volume, and at least one port characterized by predetermined acoustic mass intercoupling said inside volume and the region outside said enclosure having a smoothly flared input end within said inside volume and a smoothly flared output end adjacent to the region outside said inside volume, wherein said at least one port has a lengthwise axis, said at least one port being symmetrical about said lengthwise axis, the entire perimeter of both said input end and said output end being smoothly flared with the cross-sectional area of said at least one port progressively decreasing from both said input end and said output end toward a *plane of* minimum *cross-sectional area* inside said at least one port for substantially the entire distance between said input end and said *plane of* minimum *cross-sectional area* and substantially the entire distance between said output end and said *plane of* minimum *cross-sectional area.* (Amendment F of October 22, 1996.)

EXHIBIT "B"

port cross section comparison, JBL formula versus Bose patent description

Y - port radius (inches)

X - axial distance from center of port (inches)

'721 patent, Figure 1

P 3

JBL-LinearA
JBL-Exponential
Furukawa port design
mathematical ellipse